## IN THE CHANCERY COURT OF HINDS COUNTY
## FIRST JUDICIAL DISTRICT
## STATE OF MISSISSIPPI

FILED

SEP 24 2021

EDDIE JEAN CARR, CHANCERY CLERK

BY S. Anlin B.C.

THE STATE OF MISSISSIPPI, EX REL.
LYNN FITCH, ATTORNEY GENERAL

*Plaintiff,*

v.

ELI LILLY AND COMPANY; NOVO
NORDISK INC.; SANOFI-AVENTIS U.S.
LLC; EVERNORTH HEALTH, INC.
(FORMERLY EXPRESS SCRIPTS
HOLDING COMPANY); EXPRESS
SCRIPTS, INC.; EXPRESS SCRIPTS
ADMINISTRATORS, LLC; ESI MAIL
PHARMACY SERVICES, INC.; EXPRESS
SCRIPTS PHARMACY, INC.; CVS
HEALTH CORPORATION; CVS
PHARMACY, INC; CAREMARK RX,
L.L.C.; CAREMARK PCS HEALTH, L.L.C.;
CAREMARK, L.L.C.; UNITEDHEALTH
GROUP, INC.; OPTUM, INC.; OPTUMRX
INC.

*Defendants.*

Cause No. 21-cv-00738

# SECOND AMENDED COMPLAINT

**Exhibit B**

# TABLE OF CONTENTS

I. Introduction ........................................................................................... 1

II. Parties .................................................................................................. 8

    A. Plaintiff ..................................................................................... 8

    B. Manufacturer Defendants ......................................................... 8

    C. PBM Defendants ...................................................................... 12

III. Sovereign Interest ............................................................................. 33

IV. Jurisdiction and Venue ...................................................................... 34

    A. Subject Matter Jurisdiction ..................................................... 34

    B. Personal Jurisdiction ............................................................... 34

    C. Venue ....................................................................................... 35

V. Factual Allegations ............................................................................ 35

    A. Diabetes and Insulin Therapy ................................................. 35

        • Diabetes: A Growing Epidemic ....................................... 35

        • Insulin: A Century Old Drug ........................................... 36

        • Current Insulin Landscape ............................................... 39

        • Insulin Adjuncts: Type 2 Medications ............................. 40

    B. The Dramatic Rise in the Price of Diabetes Medications ......... 43

        • Defendant Manufacturers Have Increased Prices in Lockstep ............ 49

    C. Pharmaceutical Payment and Supply Chain ........................... 54

        • Drug Costs for Diabetics .................................................. 55

    D. PBMs Role in the Pharmaceutical Payment Chain ................. 56

        • The Rise of the PBMs in the Pharmaceutical Supply Chain ......... 59

        • Insular Nature of the Pharmaceutical Industry ............... 61

    E. The Insulin Pricing Scheme .................................................... 63

i

F.    Defendants Admit That They Have Engaged in The Insulin Pricing Scheme And That It Is Harming Diabetics ...................................................65

G.    Defendants Profit Off the Insulin Pricing Scheme ...................................... 70

- PBMs Pocket a Majority of Manufacturers' Secret Payments............... 71

- Insulin Pricing Scheme Allows PBMs To Profit Off Pharmacies ..........74

- Insulin Pricing Scheme Increases PBMs Mail Order Profits ................75

H.    Defendants Deceived Diabetic Mississippians and the State of Mississippi .................................................................................................76

- Manufacturer Defendants Deceived the State and Mississippi Diabetics.................................................................................................76

- PBM Defendants Deceived the State and Mississippi Diabetics...........77

I.    The Insulin Pricing Scheme Has Damaged the State of Mississippi and Diabetic Mississippians ........................................................................ 84

- The Insulin Pricing Scheme Has Damaged the State........................... 84

- The Insulin Pricing Scheme Has Damaged Mississippi Diabetics....... 85

J.    Defendants' Recent Efforts to Address Insulin Pricing Falls Far Short of Addressing the Problem ............................................................87

VI.   TOLLING OF STATUTE OF LIMITATIONS ....................................... 88

A.    Discovery Rule Tolling ....................................................................... 89

B.    Fraudulent Concealment Tolling ....................................................... 90

C.    Estoppel ............................................................................................. 90

D.    Continuing Violations........................................................................ 90

VI.   Claims for Relief................................................................................. 90

1.    Mississippi Consumer Protection Act. Miss. Code §§ 75-24-1, *et seq* (By the State in its *parens patriae* capacity on behalf of Mississippi diabetics against Defendants) ...................................................... 90

2.    Mississippi Consumer Protection Act. Miss. Code §§ 75-24-1, *et seq* (By the State in its capacity as a payor for and purchaser of the at-issue diabetes medications against Defendants) ...................................... 94

3. Unjust Enrichment (By the State in its *parens patriae* capacity on behalf of Mississippi diabetics against Defendants)...................................97

4. Unjust Enrichment (By the State in its capacity as a payor for and purchaser of the at-issue diabetes medications against Defendants) ....... 99

5. Civil Conspiracy ........................................................................................ 100

**VII. Motion for Injunction**

**VIII. AD DAMNUM ................................................................................103**

# TABLE OF FIGURES

Figure 1: Price Increase of Insulin vs. Selected Consumer Goods  from 1997-2018 ..........4

Table 1: Diabetes medications at issue in this case ......................................................... 42

Figure 2: Rising reported prices of Humulin R (500U/mL) from 1997-2021................. 44

Figure 3: Rising reported prices of Humalog vials and pens  from 1996-2021................45

Figure 4: Rising reported prices of Levemir from 2006-2021......................................... 46

Figure 5: Rising reported prices of Novolog vials and pens  from 2002-2021.................47

Figure 6: Rising reported prices of Lantus vials and pens  from 2001-2021 .................. 48

Figure 7: Rising reported prices of long-acting insulins................................................. 50

Figure 8: Rising reported prices of rapid-acting insulins................................................ 51

Figure 9: Rising reported price increases for human insulins.........................................52

Figure 10: Rising reported prices of Type 2 drugs .......................................................... 53

Figure 11: Lockstep insulin price increases ..................................................................... 54

Figure 12: Insulin distribution and payment chain ......................................................... 57

Figure 13: PBM consolidation ......................................................................................... 60

The Honorable Lynn Fitch, Attorney General, brings this action on behalf of the State of Mississippi (the "State" or "Plaintiff"), in its proprietary capacity and in its capacity as *parens patriae*, for restitution, damages, punitive damages, disgorgement, penalties and injunctive relief under the laws of the State of Mississippi against the above-named Defendants.

## I.      Introduction

1.      Diabetes is an epidemic in Mississippi. Mississippi has the highest prevalence of diabetes in the United States with 13.6% of its population—over 400,000 people—living with diabetes. An additional 750,000 Mississippi residents have prediabetes, which is when a person's blood sugar level is higher than it should be and signifies that the person is at a much greater risk for developing diabetes.

2.      Diabetes is the leading cause of blindness, kidney failure and lower limb amputations and is the seventh leading cause of death in Mississippi despite the availability of effective treatment. Over 22% of all hospitalizations in Mississippi are attributable to diabetes.

3.      The economic impact of diabetes is staggering. The total estimated cost of diagnosed diabetes in Mississieppi is $3.5 billion per year. One in four health care dollars is spent caring for people with diabetes.

4.      Approximately 100,000 Mississippians rely on daily insulin treatments to survive, and 300,000 diabetics in Mississippi use either oral medications, insulin or a combination of both to treat and control diabetes. As a result, hundreds of thousands of Mississippi residents must rely on the companies that manufacture diabetes medications to stay alive and thus are at the mercy of these manufacturers.

5.    Defendants Eli Lilly, Novo Nordisk and Sanofi (collectively, "Manufacturer Defendants" or "Manufacturers") manufacture the vast majority of insulins and other diabetic medications available in the United States.

6.    Defendants CVS Caremark, Express Scripts and OptumRx (collectively "PBM Defendants" or "PBMs") manage the pharmacy benefits for the vast majority of individuals in the United States.

7.    As part of this work, PBM Defendants establish national formulary offerings that, among other things, set the baseline for which diabetes medications are covered and not covered by nearly every payor in the United States

8.    The PBM Defendants understand that their national formulary offerings drive drug utilization.

9.    The more accessible a drug is on the PBMs' national formulary, the more that drug will be used throughout the United States, including in Mississippi.

10.   The Manufacturer Defendants likewise understand that the PBM Defendants' national formularies drive drug utilization throughout the country and in Mississippi.

11.   Given the PBMs' market power and the crucial role their standard formularies play in the pharmaceutical pricing chain, both Defendant groups understand that the PBM Defendants wield enormous control over drug purchasing behavior.

12.   The fraudulent conspiracy at the root of this Second Amended Complaint—the Insulin Pricing Scheme—was born from this mutual understanding.

13.   Over the course of the last fifteen years, and pursuant to the Insulin Pricing Scheme, Manufacturer Defendants have in lockstep raised the reported prices of their

respective diabetes drugs in an astounding manner despite the fact that the cost to produce these drugs has decreased during that same time period.

14.     Insulins, which today cost Manufacturer Defendants less than $2 to produce and that were originally priced at $20 when released in the late 1990s, now range between $300 and $700.

15.     In the last decade alone, Manufacturer Defendants have in tandem increased the prices of their insulins up to 1000%, taking the same increase down to the decimal point within a few days of each other.

16.     Figure 1 illustrates the rate in which Defendant Eli Lilly raised the price of its analog insulin, Humalog, compared to the rate of inflation for other consumer goods and services from 1997-2018.



Figure 1: Price Increase of Insulin vs. Selected Consumer Goods from 1997-2018

17.     Remarkably, nothing about these medications has changed during that time period; today's $350 insulin is the exact same one Defendants originally sold for $20.

18.     The current exorbitant price stands in stark contrast to insulin's origins: the discoverers sold the original patent for $1 to ensure that the medication would remain affordable. Today, insulin has become the poster child for skyrocketing pharmaceutical prices.

19.     Both the Manufacturer and PBM Defendants play vital roles and profit immensely from the Insulin Pricing Scheme.

20.     The Insulin Pricing Scheme works as follows: first, to gain formulary access from the PBM Defendants for their diabetic treatments, Manufacturer Defendants artificially and willingly raise their prices, and then secretly pay a significant portion of that price back to the PBMs. These Manufacturer Payments[1] are provided under a variety of labels—rebates, discounts, credits, inflation/price protection fees, administration fees, etc. Yet, however they are described, these Manufacturer Payments, along with the inflated reported prices, are *quid pro quo* for formulary inclusion in their national offerings.

21.     PBMs then grant national formulary status based upon the highest inflated price and upon which diabetes medications generate the largest profits for these PBMs.

22.     The Insulin Pricing Scheme creates a "best of both worlds" scenario for Defendants. Manufacturer Defendants are able to make these secret Manufacturer

---

[1] In the context of this Second Amended Complaint, the term "Manufacturer Payments" is defined as all payments or financial benefits of any kind conferred by the Manufacturer Defendants to PBM Defendants (or a subsidiary, affiliated entity, or group purchasing organization or rebate aggregator acting on the PBM's behalf), either directly via contract or indirectly via Manufacturer-controlled intermediaries. Manufacturer Payments includes rebates, administrative fees, inflation fees, pharmacy supplemental discounts, volume discounts, price or margin guarantees and any other form of consideration exchanged.

Payments to buy preferred formulary position—which significantly increases their revenue—without sacrificing their profit margins.

23.     PBM Defendants profit off the artificially inflated prices that result from the scheme in numerous ways, including: (1) retaining a significant—yet undisclosed—percentage of the secret Manufacturer Payments, (2) using the price produced by the Insulin Pricing Scheme to generate profits from pharmacies and (3) relying on those same artificial prices to drive up the PBMs' margins through their own mail order pharmacies.

24.     Thus, while the PBM Defendants represent both publicly and to their clients that they use their market power to drive down prices for diabetes medications, these representations are patently false.  Instead, the national negotiations, secret Manufacturer Payments (exchanged for formulary inclusion) and the actual formulary construction, which undergird Defendants' fraudulent scheme, are directly responsible for the skyrocketing price of insulin.

25.     Moreover, because the price, which every entity within the pharmaceutical pricing chain pays, is based upon the Manufacturers' reported price, every single diabetic, payor and health plan in the United States, including in Mississippi, who purchases these life-sustaining drugs, has been directly and detrimentally affected by Defendants' Insulin Pricing Scheme.

26.     Payors who reimburse for the at-issue diabetes medications, including the State of Mississippi, have been overcharged millions of dollars a year.

27.     Diabetics, including those in Mississippi, have been overcharged millions of dollars a year as well in out-of-pocket costs.

28.     For diabetic Mississippians, the physical, emotional, and financial tolls of paying such excessive prices for diabetes medications is devastating. Unable to afford the

drugs their doctors prescribe, many diabetics in Mississippi are forced to ration or under-dose their insulin, inject expired insulin, reuse needles, and starve themselves to control their blood sugars with as little insulin as possible. These behaviors are extremely dangerous and can lead to serious complications or even death.

29.     The Honorable Lynn Fitch, Attorney General seeks legal relief against the Defendants to protect the health and economic well-being of the hundreds of thousands of diabetic citizens of the State of Mississippi and to protect the economic interests of the State as a payor for and purchaser of millions of dollars per year in Defendants' diabetes medications.

30.     The Honorable Lynn Fitch, Attorney General, brings this action on behalf of the State of Mississippi and its citizens in three distinct capacities: (a) on behalf of diabetic Mississippians in its *parens patriae* capacity, (b) on behalf of the State as a payor of diabetes medications through its state government employee health plans, and  (c) on behalf of the State as a purchaser of diabetes medications in state-run facilities, including through the Mississippi Department of Corrections and state-run hospitals.

31.     This action asserts causes for Defendants' violation of the Mississippi Consumer Protection Act, unjust enrichment and civil conspiracy.

32.     This action seeks injunctive relief, restitution, disgorgement, actual damages, punitive damages and civil penalties to address and abate the harm caused by the Insulin Pricing Scheme.

33.     The relevant period for damages alleged in this Second Amended Complaint is from 2003 continuing through the present.

## II.    Parties

### A.    Plaintiff

34.    **Plaintiff, the State of Mississippi**. The State of Mississippi is the sole Plaintiff in this action, brought in its name on relation of the Attorney General, the Honorable Lynn Fitch.  Pursuant to Miss. Const. art. 6, § 173, Miss. Code Ann. § 7-5-1, and Miss. Code Ann. §§ 75-24-1, *et seq.*, the Attorney General brings this action in the State's sovereign capacity on behalf of the State and its citizens who are residents of the State of Mississippi.

### B.    Manufacturer Defendants

35.    **Defendant Eli Lilly and Company ("Eli Lilly)** is an Indiana corporation with its principal place of business at Lilly Corporate Center, Indianapolis, Indiana 46285.

36.    Eli Lilly is registered to do business in Mississippi and has been since at least 1966. Eli Lilly may be served through its registered agent: NRAI Agents, Inc., 645 Lakeland East Dr., Suite 101, Flowood, Mississippi 39232.

37.    Eli Lilly holds an active Drug Facility Permit with the Mississippi Board of Pharmacy (License #: 15663/16.5a).

38.    In Mississippi and nationally, Eli Lilly manufactures, promotes and distributes several at-issue diabetes medications: Humulin N, Humulin R, Humalog, Trulicity and Basaglar.

39.    Eli Lilly's global revenues in 2019 were $4.13 billion from Trulicity, $2.82 billion from Humalog, $1.29 billion from Humulin and $1.11 billion from Basaglar.

40.    Eli Lilly's global revenues in 2018 were $3.2 billion from Trulicity, $2.99 billion from Humalog, $1.33 billion from Humulin and $801 million from Basaglar.

41.    Eli Lilly transacts business in Mississippi, targeting the State of Mississippi market for its products, including the at-issue diabetes medications.

42.    Eli Lilly employs sales representatives throughout Mississippi, to promote and sell Humulin N, Humulin R, Humalog, Trulicity and Basaglar.

43.    Eli Lilly also directs advertising and informational materials to Mississippi physicians and potential users of Eli Lilly's products.

44.    At all times relevant hereto, in furtherance of the Insulin Pricing Scheme, Eli Lilly published its prices of the at-issue diabetes medications throughout Mississippi for the purpose of payment and reimbursement by Mississippi residents and payors in Mississippi, including the State.

45.    During the relevant time period, the State of Mississippi spent millions of dollars per year on Eli Lilly's at-issue drugs through its employee health plans and through purchases for use in state-run facilities.

46.    During the relevant time period, diabetics in Mississippi spent millions of dollars per year out of pocket on Eli Lilly's at-issue drugs.

47.    All of the Eli Lilly diabetes medications related to the at-issue transactions were paid for and/or reimbursed in Mississippi based on the specific false and inflated prices Eli Lilly caused to be published in Mississippi in furtherance of the Insulin Pricing Scheme.

48.    **Defendant Sanofi-Aventis U.S. LLC ("Sanofi")** is a Delaware limited liability company with its principal place of business at 55 Corporate Drive, Bridgewater, New Jersey 08807.

49.    Sanofi may be served through its registered agent: Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808. Sanofi's sister company,

Sanofi Pasteur Inc., is registered to do business in Mississippi and has been since at least 1992.

50.    Sanofi holds three active Drug Facility Permits with the Mississippi Board of Pharmacy (License #s: 16521 / 16.5a, 16520 / 16.5a, and 16519 / 16.5a).

51.    Sanofi manufactures, promotes and distributes pharmaceutical drugs both in Mississippi and nationally, including several at-issue diabetes medications: Lantus, Toujeo and Apidra.

52.    Sanofi's global revenues in 2019 were $3.50 billion from Lantus, $1.03 billion from Toujeo and $400 million from Apidra.

53.    Sanofi's global revenues in 2018 were $3.9 billion from Lantus, $923 million from Toujeo and $389 million from Apidra.

54.    Sanofi transacts business in Mississippi, targeting the Mississippi market for its products, including the at-issue diabetes medications.

55.    Sanofi employs sales representatives throughout Mississippi to promote and sell Lantus, Toujeo and Apidra.

56.    Sanofi also directs advertising and informational materials to Mississippi physicians and potential users of Sanofi's products.

57.    At all times relevant hereto, in furtherance of the Insulin Pricing Scheme, Sanofi published its prices of its at-issue diabetes medications throughout Mississippi for the purpose of payment and reimbursement by Mississippi residents and payors in Mississippi, including the State.

58.    During the relevant time period, the State of Mississippi spent millions of dollars per year on Sanofi's at-issue drugs through its employee health plans and through purchases for use in state-run facilities.

59.   During the relevant time period, diabetics in Mississippi spent millions of dollars per year out of pocket on Sanofi's at-issue drugs.

60.   All of the Sanofi diabetes medications related to the at-issue transactions were paid for and/or reimbursed in Mississippi based on the specific false and inflated prices Sanofi caused to be published in Mississippi in furtherance of the Insulin Pricing Scheme.

61.   **Defendant Novo Nordisk Inc. ("Novo Nordisk")** is a Delaware corporation with its principal place of business at 800 Scudders Mill Road, Plainsboro, New Jersey 08536.

62.   Novo Nordisk may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

63.   Novo Nordisk holds an active Drug Facility Permit with the Mississippi Board of Pharmacy (License #: 17784 / 16.4a).

64.   Novo Nordisk manufactures, promotes and distributes pharmaceutical drugs both in Mississippi and nationally, including at-issue diabetic medications: Novolin R, Novolin N, Novolog, Levemir, Tresiba, Victoza and Ozempic.

65.   Nordisk's global revenues in 2019 were $2.89 billion from Novolog, $973 million from Levemir, $968 million from Tresiba, $2.29 billion from Victoza and $1.17 billion from Ozempic.

66.   Novo Nordisk's global revenues in 2018 were $4.19 billion from Novolog, $1.66 billion from Levemir, $1.19 billion from Tresiba, $3.61 billion from Victoza and $185 million from Ozempic.

67.    Novo Nordisk transacts business in Mississippi, targeting Mississippi for its products, including the at-issue diabetes medications.

68.    Novo Nordisk employs sales representatives throughout Mississippi to promote and sell Novolin R, Novolin N, Novolog, Levemir, Tresiba, Victoza and Ozempic.

69.    Novo Nordisk also directs advertising and informational materials to Mississippi physicians and potential users of Novo Nordisk's products.

70.    At all times relevant hereto, in furtherance of the Insulin Pricing Scheme, Novo Nordisk published its prices of its at-issue diabetes medications throughout Mississippi for the purpose of payment and reimbursement by Mississippi residents and payors in Mississippi, including the State.

71.    During the relevant time period, the State of Mississippi spent millions of dollars per year on Novo Nordisk's at-issue drugs through its employee health plans and through purchases for use in state-run facilities.

72.    During the relevant time period, diabetics in Mississippi spent millions of dollars per year out of pocket on Novo Nordisk's at-issue drugs.

73.    All of the Novo Nordisk diabetes medications related to the at-issue transactions were paid for and/or reimbursed in Mississippi based on the specific false and inflated prices Novo Nordisk caused to be published in Mississippi in furtherance of the Insulin Pricing Scheme.

74.    Collectively, Defendants Eli Lilly, Novo Nordisk and Sanofi are referred to as "Manufacturer Defendants" or "Manufacturers."

## C.    PBM Defendants

75.    **Defendant CVS Health Corporation** ("CVS Health") is a Delaware corporation with its principal place of business at One CVS Drive, Woonsocket, Rhode

Island 02895. CVS Health transacts business and has locations throughout the United States and Mississippi.

76.     CVS Health may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

77.     CVS Health—through its executives and employees, including its CEO, Chief Medical Officer, Executive Vice Presidents, Senior Executives in Trade Finance, Senior Vice Presidents and Chief Communication Officers—are directly involved in creating and implementing the company policies that inform its PBM services and formulary construction, including with respect to the at-issue drugs involved in the Insulin Pricing Scheme. CVS Health's conduct had a direct effect in Mississippi and damaged diabetic Mississippians and the State.  On a regular basis, CVS Health executives and employees communicate with and direct its subsidiaries related to the at-issue PBM services and formulary activities.

78.     In each annual report for at least the last decade, CVS Health (or its predecessor) has repeatedly and explicitly stated that *CVS Health*:

- designs pharmacy benefit plans that minimize the costs to the client while prioritizing the welfare and safety of the clients' members;

- negotiates with pharmaceutical companies to obtain discounted acquisition costs for many of the products on CVS Health's drug lists, and these negotiated discounts enable CVS Health to offer reduced costs to clients;

- utilizes an independent panel of doctors, pharmacists and other medical experts, referred to as its Pharmacy and Therapeutics Committee, to select drugs that meet the highest standards of safety and efficacy for inclusion on its drug lists.

79.     CVS Health publicly represents that CVS Health constructs programs that lower the cost of the at-issue diabetes medications. For example, in 2016, CVS Health

announced a new program to "reduce overall spending in diabetes" that is available in all states, including Mississippi, stating:

> "*CVS Health* introduced a new program available to help the company's pharmacy benefit management (PBM) clients to improve the health outcomes of their members, *lower pharmacy costs [for diabetes medications]* through aggressive trend management and decrease medical costs . . . [and that] participating clients could save between $3000 to $5000 per year for each member who successfully improves control of their diabetes" (emphasis supplied).

80.    In 2017, CVS Health stated that "*CVS Health* pharmacy benefit management (PBM) strategies reduced trend for commercial clients to 1.9 percent per member per year the lowest in five years. Despite manufacturer price increases of near 10 percent, *CVS Health* kept drug price growth at a minimal 0.2 percent."

81.    CVS Health has entered into contracts and business relationships in Mississippi, including in 2015 when CVS Health announced a clinical affiliation with the University of Mississippi Medical Center to provide integrated health information in order to allow patients to better monitor their chronic diseases, such as diabetes.

82.    CVS Health is the immediate or indirect parent of many pharmacy subsidiaries that own and operate hundreds of pharmacies throughout Mississippi that dispensed and received payment for the at-issue diabetes medications throughout the relevant time period.

83.    **Defendant CVS Pharmacy, Inc.** ("CVS Pharmacy") is a Rhode Island corporation whose principal place of business is at the same location as CVS Health. CVS Pharmacy is a wholly owned subsidiary of CVS Health.

84.    CVS Pharmacy is the immediate or indirect parent of many pharmacy subsidiaries that own and operate hundreds of pharmacies throughout Mississippi and is

directly involved in these pharmacies dispensing and payment policies related to the at-issue diabetes medications.

85.    CVS Pharmacy is also the immediate and direct parent of Defendant Caremark Rx, L.L.C.

86.    CVS Pharmacy is registered to do business in Mississippi and has been since at least 1997.

87.    CVS Pharmacy may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

88.    **Defendant Caremark Rx, L.L.C.** is a Delaware limited liability company and an immediate or indirect parent of many subsidiaries, including pharmacy benefit management and mail order subsidiaries that engaged in the activities in Mississippi that gave rise to this Second Amended Complaint.

89.    Caremark Rx, L.L.C. is a wholly owned subsidiary of Defendant CVS Pharmacy and its principal place of business is at the same location as CVS Pharmacy and CVS Health.

90.    Caremark Rx, L.L.C. may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

91.    During the relevant time period, Caremark Rx, L.L.C. provided PBM and mail order pharmacy services in Mississippi that gave rise to the Insulin Pricing Scheme, which damaged diabetic Mississippians and the State.

92.   **Defendant Caremark L.L.C.** is a California limited liability company whose principal place of business is at the same location as CVS Health. Caremark, L.L.C. is a wholly owned subsidiary of Caremark Rx, L.L.C.

93.   Caremark, L.L.C. is registered to do business in Mississippi and has been since at least 2007. Caremark, L.L.C. may be served through its registered agent: CT Corporation System, 645 Lakeland East Drive, Suite 101, Flowood, Mississippi 39232.

94.   Caremark, L.L.C. holds one active Drug Facility Permit (License #: 15883 / 16.5a), one active PBM Permit (License #:140123 / 14.1) and two active Non-Resident Facility Permits (License #s: 03556 / 7.1 and 16616 / 7.1) with the Mississippi Board of Pharmacy.

95.   During the relevant time period, Caremark, L.L.C. also provided PBM and mail order pharmacy services in Mississippi that gave rise to the Insulin Pricing Scheme, which damaged diabetic Mississippians and the State.

96.   **Defendant CaremarkPCS Health, L.L.C.** is a Delaware limited liability company whose principal place of business is at the same location as CVS Health. CVS Health is the direct or indirect parent company of CaremarkPCS Health LLC.

97.   CaremarkPCS Health, L.L.C., doing business as CVS Caremark, provides pharmacy benefit management services.

98.   CaremarkPCS Health, L.L.C. is registered to do business in Mississippi and has been since at least 2014.

99.   CaremarkPCS Health, L.L.C. may be served through its registered agent: CT Corporation System, 645 Lakeland East Drive, Suite 101, Flowood, Mississippi 39232.

100.   CaremarkPCS Health, L.L.C. holds an active PBM Permit (License #:140116 / 14.1) with the Mississippi Board of Pharmacy.

101.    During the relevant time period, CaremarkPCS Health, L.L.C. provided PBM services in Mississippi, which gave rise to the Insulin Pricing Scheme and damaged diabetic Mississippians and the State.

102.    Defendants CaremarkPCS Health, L.L.C. and Caremark, L.L.C. are agents and/or alter egos of Caremark Rx, L.L.C., CVS Pharmacy and Defendant CVS Health.

103.    As a result of numerous interlocking directorships and shared executives, Caremark Rx, L.L.C., CVS Pharmacy and Defendant CVS Health control CaremarkPCS Health, L.L.C and Caremark, L.L.C.'s operations, management and business decisions related to the at-issue formulary construction, negotiations and mail order pharmacy services to the ultimate detriment of Mississippi diabetics and the State. For example:

    a.    During the relevant time period, these parent and subsidiaries have had common officers and directors, including:

- Thomas S. Moffatt, Vice President and Secretary of Caremark Rx, L.L.C., CaremarkPCS Health L.L.C., and Caremark, L.L.C, is a Vice President, Assistant Secretary, and Assistant General Counsel at CVS Health;

- Melanie K. Luker, Assistant Secretary of Caremark Rx, L.L.C., CaremarkPCS Health, L.L.C, and Caremark, L.L.C., is a Manager of Corporate Services at CVS Health;

- Carol A. Denale, Senior Vice President and Treasurer of Caremark Rx, L.L.C., is Senior Vice President, Treasurer and Chief Risk Officer at CVS Health Corporation;

- John M. Conroy has been Vice President of Finance at CVS Health since 2011, and was President and Treasurer of Caremark, L.L.C. and CaremarkPCS Health L.L.C. in 2019;

- Sheelagh Beaulieu has been the Senior Director of Income Tax at CVS Health while also acting as the Assistant Treasurer at CaremarkPCS Health LLC and Caremark L.L.C.

b.     CVS Health owns all of the stock of CVS Pharmacy, which owns all of the stock of Caremark Rx, L.L.C., which owns all of the stock of Caremark L.L.C. CVS Health also directly or indirectly owns all of the stock of CaremarkPCS Health LLC.

c.     CVS Health, as a corporate family, does not operate as separate entities. The public filings, documents and statements of CVS Health presents its subsidiaries, including CVS Pharmacy, CaremarkPCS Health, L.L.C., Caremark, L.L.C. and Caremark Rx, L.L.C. as divisions or departments of one unified "diversified health services company" that "works together across our disciplines" to "create unmatched human connections to transform the health care experience." The day-to-day operations of this corporate family reflect these public statements. These entities are a single business enterprise and should be treated as such as to all legal obligations discussed in this Second Amended Complaint.

d.     All of the executives of CaremarkPCS Health, L.L.C., Caremark, L.L.C., Caremark Rx, L.L.C., and CVS Pharmacy ultimately report to the executives at CVS Health, including the President and CEO of CVS Health.

e.     As stated above, CVS Health's CEO, Chief Medical Officer, Executive Vice Presidents, Senior Executives in Trade Finance, Senior Vice Presidents and Chief Communication Officers are directly involved in the policies and business decisions of CaremarkPCS Health, L.L.C. and Caremark, L.L.C. that gave rise to the State's claims in this Second Amended Complaint.

104.    Collectively, Defendants CVS Health, CVS Pharmacy, Caremark Rx, L.L.C., Caremark, L.L.C. and CaremarkPCS Health, L.L.C, including all predecessor and successor entities, are referred to as "CVS Caremark."

105.    CVS Caremark is named as a Defendant in its capacities as a PBM and mail order pharmacy.

106.    In its capacity as a PBM, CVS Caremark coordinates with Novo Nordisk, Eli Lilly and Sanofi regarding the price of the at-issue diabetes medications, as well as for the placement of these firms' diabetes medications on CVS Caremark's formularies.

107.    CVS Caremark has the largest PBM market share based on total prescription claims managed, representing approximately 40% of the national market. CVS Caremark's pharmacy services segment, which includes PBM activities, but not its retail/long-term care segment, generated $141.5 billion in total revenues last year.

108.    In Mississippi, during the relevant time period, CVS Caremark controlled up to 15% of the PBM market share based on covered lives.

109.    At all times relevant hereto, CVS Caremark derived substantial revenue providing pharmacy benefits in Mississippi.

110.    During the relevant time period, in addition to its critical role in the Insulin Pricing Scheme, which detrimentally affected all payors and purchasers of the at-issue drugs, CVS Caremark also provided PBM services to the State.

111.    At all times relevant hereto, CVS Caremark derived substantial revenue providing mail order pharmacy services in Mississippi.

112.    At all times relevant hereto, CVS Caremark offered pharmacy benefit management services nationwide and maintained standard formularies that are used nationwide, including in Mississippi. During the relevant time period, those formularies

included diabetes medications, including all of those at issue in this Second Amended Complaint.

113.   CVS Caremark purchases drugs directly from manufacturers and through drug wholesalers for dispensing through its mail order pharmacy.

114.   At all times relevant hereto, CVS Caremark dispensed the at-issue medications nationwide and directly to diabetics in Mississippi through its mail order pharmacies.

115.   At all times relevant hereto, CVS Caremark had express agreements with Defendants Novo Nordisk, Sanofi and Eli Lilly related to the Manufacturer Payments paid by the Manufacturer Defendants to CVS Caremark, as well as agreements related to the Manufacturers' at-issue drugs sold through CVS Caremark's mail order pharmacies.

116.   **Defendant Evernorth Health, Inc. ("Evernorth"),** formerly known as Express Scripts Holding Company, is a Delaware corporation with its principal place of business at 1 Express Way, St. Louis, Missouri 63121.[2]

117.   Evernorth may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

118.   Evernorth, through its executives and employees including its CEO and Vice Presidents, is directly involved in shaping the company policies that inform its PBM services and formulary construction, including with respect to the at-issue drugs, related to the Insulin Pricing Scheme. Evernorth's conduct had a direct effect in Mississippi and damaged diabetic Mississippians and the State. On a regular basis, Evernorth executives

---

[2] Until 2021, Evernorth Health, Inc. conducted business under the name Express Scripts Holding Company. For the purposes of this Second Amended Complaint "Evernorth" refers to Evernorth Health, Inc and Express Scripts Holding Company.

and employees communicate with and direct its subsidiaries related to the at-issue PBM services and formulary activities.

119.    Evernorth executives are members of the company's formulary committees that construct the at-issue formularies.

120.    Evernorth is the immediate or indirect parent of pharmacy and PBM subsidiaries that operate throughout Mississippi, which engaged in the activities that gave rise to this Second Amended Complaint.

121.    In each annual report for at least the last decade, Evernorth has repeatedly and explicitly:

- Acknowledged that it is directly involved in the company's PBM services, stating "[Evernorth is] the largest stand-alone PBM company in the United States."

- Stated that Evernorth: "provid[es] products and solutions that focus on improving patient outcomes and assist in controlling costs; evaluat[es] drugs for efficacy, value and price to assist clients in selecting a cost-effective formulary; [and] offer[s] cost-effective home delivery pharmacy and specialty services that result in cost savings for plan sponsors and better care for members."

122.    **Defendant Express Scripts, Inc.** is a Delaware corporation and is a wholly owned subsidiary of Defendant Evernorth. Express Scripts, Inc.'s principal place of business is at the same location as Evernorth.

123.    Express Scripts, Inc. is registered to do business in Mississippi and has been since at least 2010.

124.    Express Scripts, Inc. may be served through its registered agent: Corporation Service Company, 7716 Old Canton Road, Suite C, Madison, Mississippi 39910.

125. Express Scripts, Inc. is the immediate or indirect parent of pharmacy and PBM subsidiaries that operate throughout Mississippi that engaged in the conduct, which gave rise to this Second Amended Complaint.

126. During the relevant time period, Express Scripts Inc. was directly involved in the PBM and mail order pharmacy services, which gave rise to the Insulin Pricing Scheme and damaged diabetic Mississippians and the State.

127. **Defendant Express Scripts Administrators, LLC,** doing business as Express Scripts and formerly known as Medco Health, L.L.C., is a Delaware limited liability company and is a wholly owned subsidiary of Evernorth. Express Scripts Administrators, LLC's principal place of business is at the same location as Evernorth.

128. Express Scripts Administrators, LLC is registered to do business in Mississippi and has been since at least 2006.

129. Express Scripts Administrators, LLC may be served through its registered agent: Corporation Service Company, 7716 Old Canton Road, Suite C, Madison, Mississippi 39910.

130. Express Scripts Administrators, LLC holds an active PBM Permit (License #: 140117 / 14.1) with the Mississippi Board of Pharmacy.

131. During the relevant time period, Express Scripts Administrators, LLC provided the PBM services in Mississippi discussed in this Second Amended Complaint that gave rise to the Insulin Pricing Scheme that damaged diabetic Mississippians and the State.

132. **Defendant ESI Mail Pharmacy Service, Inc.** is a Delaware corporation and is a wholly owned subsidiary of Defendant Evernorth. ESI Mail Pharmacy Service, Inc.'s principal place of business is at the same location as Evernorth.

133.   ESI Mail Pharmacy Service, Inc. may be served through its registered agent: Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

134.   ESI Mail Pharmacy Service, Inc. holds four active Non-Resident Facility Permits (License #s: 13873 / 7.1, 13921 / 7.1, 05805 / 7.1, 02882 / 7.1) with the Mississippi Board of Pharmacy.

135.   During the relevant time period, ESI Mail Pharmacy Services provided the mail order pharmacy services in Mississippi discussed in this Second Amended Complaint, which gave rise to the Insulin Pricing Scheme and damaged diabetic Mississippians and the State.

136.   **Defendant Express Scripts Pharmacy, Inc.** is a Delaware corporation and is a wholly owned subsidiary of Defendant Evernorth. Express Scripts Pharmacy, Inc.'s principal place of business is at the same location as Evernorth.

137.   Express Scripts Pharmacy, Inc. may be served through its registered agent: Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

138.   Express Scripts Pharmacy, Inc. holds six active Non-Resident Facility Permits (License #s: 13393 / 7.1, 03645 / 7.1, 04548 / 7.1, 08226 / 7.1, 05397 / 7.1, 05060 / 7.1) with the Mississippi Board of Pharmacy.

139.   During the relevant time period, Express Scripts Pharmacy, Inc. provided the mail order pharmacy services in Mississippi discussed in this Second Amended Complaint, which gave rise to the Insulin Pricing Scheme and damaged diabetic Mississippians and the State.

140.   As a result of numerous interlocking directorships and shared executives, Evernorth and Express Scripts, Inc. control Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc. and Express Scripts Pharmacy, Inc's operations, management and

23

business decisions related to the at-issue formulary construction, negotiations and mail order pharmacy services to the ultimate detriment of Mississippi diabetics and the State. For example:

      a.    During the relevant time period, these parent and subsidiaries have had common officers and directors:

- Officers and/or directors shared between Express Scripts, Inc. and Evernorth include Bradley Phillips, Chief Financial Officer; David Queller, President; Jill Stadelman, Managing Counsel and Scott Lambert, Treasury Manager Director;

- Executives shared between Express Scripts Administrators, LLC and Evernorth include Bradley Phillips, Chief Financial Officer; and Priscilla Duncan, Associate Senior Counsel;

- Officers and/or directors shared between ESI Mail Pharmacy Service, Inc. and Evernorth include Bradley Phillips, Chief Financial Officer; Priscilla Duncan, Associate Senior Counsel; and Joanne Hart, Treasury Director; and

- Officers and/or directors shared between Express Scripts Pharmacy, Inc. and Evernorth include Bradley Phillips, Chief Financial Officer; Jill Stadelman, Managing Counsel; Scott Lambert, Treasury Manager Director; and Joanne Hart, Treasury Director.

      b.    Evernorth directly or indirectly owns all of the stock of Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc. and Express Scripts, Inc.

      c.    The Evernorth corporate family does not operate as separate entities. The public filings, documents and statements of Evernorth presents its subsidiaries, including Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc. and Express Scripts, Inc. as divisions or departments of a single company that "unites businesses that have as many as 30+ years of experience . . . [to] tak[e] health services

further with integrated data and analytics that help us deliver better care to more people." The day-to-day operations of this corporate family reflect these public statements. All of these entities are a single business enterprise and should be treated as such as to all legal obligations detailed in this Second Amended Complaint.

d.      All of the executives of Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc. and Express Scripts, Inc. ultimately report to the executives, including the CEO, of Evernorth.

e.      As stated above, Evernorth's CEO and other executives and officers are directly involved in the policies and business decisions of Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc. and Express Scripts, Inc. that gave rise to the State's claims in this Second Amended Complaint.

141.    Collectively, Defendants Evernorth Health, Inc., Express Scripts, Inc., Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc. and Express Scripts Pharmacy, Inc., including all predecessor and successor entities, are referred to as "Express Scripts."

142.    Express Scripts is named as a Defendant in its capacities as a PBM and mail order pharmacy.

143.    In its capacity as a PBM, Express Scripts coordinates with Novo Nordisk, Eli Lilly and Sanofi regarding the price of the at-issue diabetes medications, as well as for the placement of these firms' diabetes medications on Express Script's formularies.

144.    Prior to merging with Cigna in 2019, Express Scripts was the largest independent PBM in the United States. During the relevant period of this Second

Amended Complaint, Express Scripts controlled 30% of the PBM market in the United States. Express Scripts has only grown larger since the Cigna merger.

145.   In Mississippi, during the relevant time period, Express Scripts controlled up to 30% of the PBM market share based on covered lives, including at certain times up to 92% of the commercial insurance market in Mississippi.

146.   In 2017, annual revenue for Express Scripts was over $100 billion.

147.   As of December 31, 2018, more than 68,000 retail pharmacies, representing over 98% of all retail pharmacies in the nation, participated in one or more of Express Scripts' networks.

148.   Express Scripts transacts business throughout the United States and Mississippi.

149.   At all times relevant hereto, Express Scripts derived substantial revenue providing pharmacy benefits in Mississippi.

150.   At all times relevant hereto, Express Scripts derived substantial revenue providing mail order pharmacy services in Mississippi.

151.   At all times relevant hereto, Express Scripts offered pharmacy benefit management services nationwide and maintained standard formularies that are used nationwide, including in Mississippi. During the relevant time period, those formularies included diabetes medications, including all of those at issue in this Second Amended Complaint.

152.   Express Scripts purchases drugs directly from manufacturers for dispensing through its mail order pharmacy.

153.   At all times relevant hereto, Express Scripts dispensed the at-issue medications nationwide and directly to diabetics in Mississippi through its mail order pharmacies.

154.   During the relevant time period, in addition to its critical role in the Insulin Pricing Scheme, which detrimentally affected all payors and purchasers of the at-issue drugs, Express Scripts also provided services to the State related to the at-issue Manufacturer Payments and pharmacy benefits.

155.   At all times relevant hereto, Express Scripts had express agreements with Defendants Novo Nordisk, Sanofi and Eli Lilly related to the Manufacturer Payments paid by the Manufacturer Defendants to Express Scripts, as well as agreements related to the Manufacturers' at-issue drugs sold through Express Scripts' mail order pharmacies.

156.   **Defendant UnitedHealth Group, Inc**. is a corporation organized under the laws of Delaware with its principal place of business at 9900 Bren Road East, Minnetonka, Minnesota, 55343.

157.   UnitedHealth Group, Inc. may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

158.   UnitedHealth Group, Inc. is a diversified managed healthcare company. In 2015, UnitedHealth Group reported revenue in excess of $157 billion, and the company is currently ranked sixth on the Fortune 500 list. UnitedHealth Group, Inc. offers a spectrum of products and services including health insurance plans through its wholly owned subsidiaries and prescription drugs through its PBM, OptumRx.

159.   One-third of the overall revenues of UnitedHealth Group come from OptumRx.

160.   UnitedHealth Group, through its executives and employees, is directly involved in the company policies that inform its enterprise-wide PBM services and formulary construction, including with respect to the at-issue drugs and related to the Insulin Pricing Scheme. For example, UnitedHealth Group executives structure, analyze and direct the company's overarching policies, including with respect to PBM and mail order services, as a means of maximizing profitability across the corporate family. UnitedHealth Group's conduct had a direct effect in Mississippi and damaged diabetic Mississippians and the State.

161.   UnitedHealth Group states in its Annual Reports that UnitedHealth Group "utilizes Optum's capabilities to help coordinate patient care, improve affordability of medical care, analyze cost trends, manage pharmacy benefits, work with care providers more effectively and create a simpler consumer experience."

162.   During the relevant time period, UnitedHealth Group has availed itself of Mississippi courts, including in *UnitedHealth Group Incorporated, et al. v. Gallagher*, 3:11cv00329-HTW-LRA (S.D. Mississippi), filed Jun. 1, 2011. In the complaint that initiated that lawsuit, UHG represented that it contracted with Mississippi residents and directly engaged in business and programs in Mississippi related to "advancing the health and well-being of individuals and communities," and that UnitedHealth Group's business interests in Mississippi included the providing PBM services to the State.

163.   **Defendant Optum, Inc.**, is a Delaware corporation with its principal place of business located in Eden Prairie, Minnesota. Optum, Inc. is a health services company managing subsidiaries that administer pharmacy benefits, including Defendant OptumRx, Inc.

28

164.   Optum, Inc. may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

165.   Optum, Inc. is directly involved, through its executives and employees, in the company policies that inform its PBM services and formulary construction, including with respect to the at-issue drugs and related to the Insulin Pricing Scheme, which had a direct effect in Mississippi and damaged diabetic Mississippians and the State.

166.   For example, according to Optum Inc.'s press releases, Optum, Inc. is "UnitedHealth Group's information and technology-enabled health services business platform serving the broad healthcare marketplace, including care providers, plan sponsors, payors, life sciences companies and consumers." In this role Optum, Inc. is directly responsible for the "business units – OptumInsight, OptumHealth and OptumRx" and the CEOs of all these companies report directly to Optum, Inc. regarding their policies, including those that inform the at-issue formulary construction and mail order activities.

167.   **Defendant OptumRx, Inc.** is a California corporation with its principal place of business at 2300 Main St., Irvine, California, 92614.

168.   OptumRx, Inc. operates as a subsidiary of OptumRx Holdings, LLC, which in turn operates as a subsidiary of Defendant Optum, Inc.

169.   OptumRx, Inc. is registered to business in Mississippi and has been since 2007. OptumRx, Inc. may be served through its registered agent: CT Corporation System, 645 Lakeland East Drive, Suite 101, Flowood, Mississippi 39232.

170.   OptumRx, Inc. holds one active PBM Permit (License #:140113 / 14.1) and three active Non-Resident Facility Permits (License #s: 07085 / 7.1, 05333 / 2.4, 17495 / 7.1) with the Mississippi Board of Pharmacy.

171.   During the relevant time period, OptumRx, Inc. provided the PBM and mail order pharmacy services in Mississippi that gave rise to the Insulin Pricing Scheme, which damaged diabetic Mississippians and the State.

172.   As a result of numerous interlocking directorships and shared executives, UnitedHealth Group and Optum, Inc control Optum Rx's operations, management and business decisions related to the at-issue formulary construction, negotiations and mail order pharmacy services to the ultimate detriment of Mississippi diabetics and the State. For example:

   a.   These parent and subsidiaries have common officers and directors, including:

   - Sir Andrew Witty is president of UnitedHealth Group and CEO of Optum, Inc.;

   - Dan Schumacher is president of Optum, Inc and named to the Office of the Chief Executive at UnitedHealth Group, Inc.;

   - Terry Clark is a senior vice president and chief marketing officer at UnitedHealth Group and oversees the branding, marketing and advertising for UnitedHealth Group and Optum, Inc.;

   - Tom Roos serves as chief accounting officer for UnitedHealth Group and Optum, Inc.;

   - Heather Lang is Deputy General Counsel, Subsidiary Governance at UnitedHealth Group, Inc. and Assistant Secretary at OptumRx, Inc.; and

   - Peter Gill is Vice President at UnitedHealth Group, Inc. and Treasurer at OptumRx, Inc.

   b.   UnitedHealth Group directly or indirectly owns all of the stock of Optum, Inc. and OptumRx, Inc.

   c.   The UnitedHealth Group corporate family does not operate as separate entities. The public filings, documents and statements of

30

UnitedHealth Group presents its subsidiaries, including Optum, Inc. and OptumRx, Inc. as divisions or departments of a single company that is "a diversified family of businesses" that "leverages core competencies" to "help[] people live healthier lives and helping make the health system work better for everyone." The day-to-day operations of this corporate family reflect these public statements. These entities are a single business enterprise and should be treated as such as to all legal obligations detailed in this Second Amended Complaint.

d.      All of the executives of Optum, Inc. and OptumRx, Inc. ultimately report to the executives, including the CEO, of UnitedHealth Group.

e.      As stated above, UnitedHealth Group's executives and officers are directly involved in the policies and business decisions of Optum, Inc. and OptumRx, Inc. that gave rise to the State's claims in this Second Amended Complaint.

173.    Collectively, Defendants UnitedHealth Group, Inc., OptumRx, Inc. and Optum, Inc., including all predecessor and successor entities, are referred to as "OptumRx."

174.    OptumRx is named as a Defendant in its capacities as a PBM and mail order pharmacy.

175.    OptumRx is a pharmacy benefit manager and, as such, coordinates with Novo Nordisk, Eli Lilly and Sanofi for the price of the at-issue diabetes medications, as well as for the placement of these firms' diabetes medications on OptumRx's drug formularies.

176.   OptumRx provides pharmacy care services to more than 65 million people in the nation through a network of more than 67,000 retail pharmacies and multiple delivery facilities.

177.   In 2018, OptumRx managed more than $91 billion in pharmaceutical spending, representing 23% of the PBM market in the United States.  OptumRx's 2018 revenue was $69 billion.

178.   In Mississippi, during the relevant time period, OptumRx controlled up to 25% of the PBM market.

179.   In 2019, OptumRx managed more than $96 billion in pharmaceutical spending, with a revenue of $74 billion.

180.   At all times relevant hereto, OptumRx derived substantial revenue providing pharmacy benefits in Mississippi.

181.   During the relevant time period, in addition to its critical role in the Insulin Pricing Scheme, which detrimentally affected all payors and purchasers of the at-issue drugs, OptumRx provided PBM services to the State.

182.   At all times relevant hereto, OptumRx derived substantial revenue through its mail order pharmacies in Mississippi.

183.   At all times relevant hereto, OptumRx offered pharmacy benefit management services nationwide and maintained standard formularies that are used nationwide, including in Mississippi. During the relevant time period, those formularies included diabetes medications, including all of those at issue in this Second Amended Complaint.

184.   At all times relevant hereto, OptumRx dispensed the at-issue medications nationwide and directly to diabetics in Mississippi through its mail order pharmacies.

185.   At all times relevant hereto, OptumRx had express agreements with Defendants Novo Nordisk, Sanofi and Eli Lilly related to the Manufacturer Payments paid by the Manufacturer Defendants to OptumRx, as well as agreements related to the Manufacturers' at-issue drugs sold through OptumRx's mail order pharmacies.

186.   Collectively, CVS Caremark, Optum Rx and Express Scripts are referred to as "PBM Defendants" or "PBMs."

### III.   Sovereign Interest

187.   This action seeks, on behalf of the State of Mississippi and its citizens, legal and equitable relief to redress injury and damage, as well as injunctive relief seeking an end to the Insulin Pricing Scheme. The State of Mississippi has a sovereign interest in protecting the well-being of the hundreds of thousands of diabetic citizens of the State of Mississippi who rely on Defendants' diabetic medications and have been damaged, and continue to be damaged, by the Defendants' unlawful conduct.

188.   Further, as a direct result of Defendants' fraudulent scheme, the State of Mississippi has been damaged by having to pay millions of dollars per year in overcharges for Defendants' diabetes medications as a payor for and reimburser of the at-issue drugs.

189.   The State of Mississippi is a real party in interest in this action.  Acting as a constitutional officer of the State of Mississippi possessing all the power and authority under the common law and statute, the Attorney General institutes this action to protect the health and economic interests of its residents, its own interests and the integrity of its marketplace.  The Attorney General is authorized to bring this action on behalf of the State of Mississippi as *parens patriae*, trustee, guardian, representative of its citizens and chief legal officer, to recover damages, punitive damages, restitution, penalties and disgorgement for and to secure injunctive relief regarding, the violations of the laws herein

alleged. The Attorney General brings this action on the State's behalf pursuant to her authority granted by Miss. Const. art. 6, § 173 and Miss. Code Ann. § 7-5-1; Miss. Code Ann. §§ 75-24-1, *et seq.*

190.    The State of Mississippi brings this action exclusively under Mississippi law and not pursuant to any federal law.

## IV.    Jurisdiction and Venue

### A.    Subject Matter Jurisdiction

191.    This Court has subject matter jurisdiction of this action pursuant to Miss. Const. art. 6, § 159 in that this action pursues legal and equitable relief under Miss. Code §§ 75-24-1, *et seq.* and the common law, the subject matter of this litigation is not made exclusively cognizable in some other court by the Constitution and laws of the State of Mississippi and in that the amount in controversy exceeds the minimum jurisdictional limits.

### B.    Personal Jurisdiction

192.    This Court has personal jurisdiction over each Defendant pursuant to Miss. Code. Ann § 13-3-57 because through the conduct described herein each Defendant is deemed to be doing business in Mississippi. Each Defendant: (a) transacts business and/or is admitted to do business within Mississippi, (b) maintains substantial contacts in Mississippi, and (c) committed the violations of Mississippi statutes and common law at issue in this lawsuit in whole or part within Mississippi. The Insulin Pricing Scheme has been directed at, and has had the foreseeable and intended effect of, causing injury to persons residing in, located in, or doing business in Mississippi, and to the State of Mississippi itself.

193.    All of the at-issue transactions occurred in Mississippi and/or involved Mississippi residents.

**C.    Venue**

194.    Venue of this action is appropriate in Hinds County, Mississippi, in that substantial acts and conduct complained of herein occurred or accrued in Hinds County, Mississippi and in that damages sustained, occurred or accrued in Hinds County, Mississippi. Miss. Code Ann. § 11-11-3.

**V.    Factual Allegations**

**A.    Diabetes and Insulin Therapy**

**<u>Diabetes: A Growing Epidemic</u>**

195.    Diabetes is a disease that occurs when a person's blood glucose, also called blood sugar, is too high. In a non-diabetic person, the pancreas secretes the hormone insulin, which controls the rate at which food is converted to glucose, or sugar, in the blood. When there is not enough insulin or cells stop responding to insulin, too much blood sugar stays in the bloodstream. Over time, that can cause serious health problems, such as heart disease, vision loss and kidney disease.

196.    There are two basic types of diabetes. Roughly 90-95% of diabetics developed the disease because they do not produce enough insulin or have become resistant to the insulin their bodies do produce. Known as Type 2, this form of diabetes is often developed later in life. While Type 2 patients can initially be treated with tablets, in the long term most patients have to switch to insulin injections.

197.    Type 1 diabetes occurs when a patient completely ceases insulin production. In contrast to Type 2 patients, people with Type 1 diabetes do not produce any insulin and, without regular injections of insulin, they will die.

198.   Insulin treatments are a necessary part of life for those who have diabetes and interruptions to a diabetic's insulin regimen can have severe consequences. Missed or inadequate insulin therapy can trigger hyperglycemia and then diabetic ketoacidosis. Left untreated, diabetic ketoacidosis can lead to loss of consciousness and death within days.

199.   The number of Americans with diabetes has exploded in the last half century. In 1958, only 1.6 million people in the United States had diabetes. By the turn of the century, that number had grown to over ten (10) million.  Fourteen (14) years later, the count tripled again. Now over thirty (30) million people—9.4% of the country—live with the disease.

200.   Likewise, the prevalence of diabetes in Mississippi has been steadily increasing as well, approximately 400,000 Mississippi adults now live with diabetes and another 750,000 have prediabetes.

201.   The burden of diabetes is not equally distributed in the United States nor in Mississippi.  Diabetes is significantly more prevalent in impoverished regions such as the Mississippi Delta. Nearly 1 in 4 Mississippians who earn less than $25,000 a year have diabetes.

202.   Minority communities are also disproportionally affected by this disease— nearly 20% of Black Mississippians have diabetes compared to 13% of non-Black Mississippians.

### Insulin: A Century Old Drug

203.   Despite its potentially deadly impact, diabetes is a highly treatable illness. For patients who are able to follow a prescribed treatment plan consistently, the health complications associated with the disease are avoidable.

204.   Unlike many high-burden diseases, treatment for diabetes has been available for almost a century.

205.   In 1922, Frederick Banting and Charles Best, while working at the University of Toronto, pioneered a technique for removing insulin from an animal pancreas that could then be used to treat diabetes. After discovery, Banting and Best obtained a patent and then sold it to the University of Toronto for $1 (equivalent of $14 today), explaining "[w]hen the details of the method of preparation are published anyone would be free to prepare the extract, but no one could secure a profitable monopoly."

206.   After purchasing the patent, the University of Toronto contracted with Defendants Eli Lilly and Novo Nordisk to scale their production. Under this arrangement, Eli Lilly and Novo Nordisk were allowed to apply for patents on variations to the manufacturing process.

207.   Although early iterations of insulin were immediately perceived as lifesaving, there have been numerous incremental improvements since its discovery. The earliest insulin was derived from animals and, until the 1980s, was the only treatment for diabetes.

208.   While effective, animal-derived insulin created the risk of allergic reaction. This risk was lessened in 1982 when synthetic insulin, known as human insulin, was developed by Defendant Eli Lilly. Eli Lilly marketed this insulin as Humulin. The development of human insulin benefited heavily from government and non-profit funding through the National Institute of Health and the American Cancer Society.

209.   Over a decade later, Eli Lilly released the first analog insulin.

210.   Analog insulin is laboratory grown and genetically altered insulin. Analogs are slight variations on human insulin that make the injected treatment act more like the insulin naturally produced and regulated by the body.

211.   Defendant Eli Lilly developed the first analog insulin, Humalog, in 1996.

212.   Other rapid-acting analogs are Defendant Novo Nordisk's Novolog and Defendant Sanofi's Apidra, with similar profiles. Diabetics use these rapid-acting insulins in combination with longer-acting insulins, such as Sanofi's Lantus and Novo Nordisk's Levemir.

213.   Manufacturer Defendants introduced these rapid-acting and long-acting analog insulins between 1996 and 2007.

214.   In 2015, Sanofi introduced Toujeo, another long-acting insulin also similar to Lantus, however Toujeo is highly concentrated, making injection volume smaller than Lantus.

215.   In 2016, Eli Lilly introduced Basaglar, which is a long-acting insulin that is biologically similar to Sanofi's Lantus.

216.   Even though insulin was first extracted nearly one hundred (100) years ago, only Defendants Eli Lilly, Novo Nordisk and Sanofi manufacture insulin in the United States.

217.   Many of the at-issue diabetes medications are now off patent. However, the Manufacturers have engaged in illicit tactics to maintain their complete market dominance.

218.   Due in large part to their ability to stifle all competition, Manufacturer Defendants make 99% of the insulins in the market today.

## Current Insulin Landscape

219.   While insulin today is generally safer and more convenient to use than when originally developed in 1922, there remain questions whether the overall efficacy of insulin has significantly improved over the last twenty (20) years.

220.   For example, while long-acting analogs may have certain advantages over human insulins, such as affording more flexibility around mealtime planning, it has yet to be shown that analogs lead to better long-term outcomes.

221.   A recent study published in the Journal of American Medical Association suggests that older human insulins may work just as well as newer analog insulins for patients with Type 2 diabetes.

222.   When discussing the latest iterations of insulins, Harvard Medical School professor David Nathan recently stated:

> I don't think it takes a cynic such as myself to see most of these [insulins] are being developed to preserve patent protection. The truth is they are marginally different, and the clinical benefits of them over the older drugs have been zero.

223.   Moreover, all of the insulins at issue in this case have either been available in the same form since the late 1990s/early 2000s or are biologically equivalent to insulins that were available then.

224.   Dr. Kasia Lipska, a Yale researcher and author of a 2018 study in the Journal of the American Medical Association on the cost of insulin, explained:

> We're not even talking about rising prices for better products here. I want to make it clear that we're talking about rising prices for the same product . . . there's nothing that's changed about Humalog. It's the same insulin that's just gone up in price and now costs ten times more.

225.   Nor have the production or research and development costs increased. In fact, in the last ten (10) years, the production costs of insulin have decreased as

39

manufacturers simplified and optimized processes. A September 2018 study published in BMJ Global Health calculated that, based on production costs, a reasonable price for a year's supply of human insulin is $48 to $71 per person and between $78 and $133 for analog insulins—which includes delivering a profit to manufacturers.

226.   Another recent study found that the Manufacturers could be *profitable charging as little as $2 a vial*. These figures stand in stark contrast to the $5,705 that a diabetic spent, on average, for insulin in 2016.

227.   Further, while research and development costs often make up a large percentage of the price of a drug, in the case of insulin the initial basic research—original drug discovery and patient trials—was performed one hundred (100) years ago.

228.   Even the more recent costs, such as developing the recombinant DNA fermentation process and the creation of insulin analogs, were incurred decades ago.

229.   Today, Manufacturer Defendants only spend a fraction of the billions of dollars in revenue they generate from the at-issue drugs on research and development.

230.   Despite this decrease in production costs and no new research and development, the reported price of insulins has risen astronomically over the last fifteen (15) years.

### Insulin Adjuncts: Type 2 Medications

231.   Over the past decade, Manufacturer Defendants have also released a number of non-insulin medications that help control the level of insulin in the bloodstream of Type 2 diabetics.

232.   In 2010, Novo Nordisk released Victoza as an adjunct to insulin to improve glycemic control. In 2014, Eli Lilly released a similar drug, Trulicity, and in 2017, Novo Nordisk did the same with Ozempic.

233.   Victoza, Trulicity and Ozempic are all medications known as glucagon-like peptide-1 receptor agonists ("GLP-1") and are similar to the GLP-1 hormone that is already produced in the body. Each of these drugs can be used in conjunction with insulins to control diabetes.

234.   Today, Manufacturer Defendants have a dominant position in the market for all diabetes medications. The following is a list of diabetes medications at issue in this lawsuit:

## Table 1: Diabetes medications at issue in this case

| Insulin Type | Action | Name | Company | FDA Approval | Current Price |
|---|---|---|---|---|---|
| *Human* | **Rapid-Acting** | Humulin R | Eli Lilly | 1982 | $178 (vial) |
| | | Humulin R 500 | Eli Lilly | 1982 | $1,784 (vial) $689 (pens) |
| | | Novolin R | Novo Nordisk | 1991 | $165 (vial) $312 (pens) |
| | **Intermediate** | Humulin N | Eli Lilly | 1982 | $178 (vial) $566 (pens) |
| | | Humulin 70/30 | Eli Lilly | 1989 | $178 (vial) $566 (pens) |
| | | Novolin N | Novo Nordisk | 1991 | $165 (vial) $312 (pens) |
| | | Novolin 70/30 | Novo Nordisk | 1991 | $165 (vial) $312 (pens) |
| *Analog* | **Rapid-Acting** | Humalog | Eli Lilly | 1996 | $342 (vial) $636 (pens) |
| | | Novolog | Novo Nordisk | 2000 | $347 (vial) $671 (pens) |
| | | Apidra | Sanofi | 2004 | $341 (vial) $658 (pens) |
| | **Long-Acting** | Lantus | Sanofi | 2000 | $ 340 (vial) $510 (pens) |
| | | Levemir | Novo Nordisk | 2005 | $ 370 (vial) $ 555 (pens) |
| | | Basaglar (Kwikpen) | Eli Lilly | 2016 | $392 (pens) |
| | | Toujeo (Solostar) | Sanofi | 2015 | $466 (pens) $622 (max pens) |
| | | Tresiba | Novo Nordisk | 2015 | $407 (vial) $610 (pens – 100u) $732 (pens – 200u) |
| *Type 2 Medications* | | Trulicity | Eli Lilly | 2014 | $1,013 (pens) |
| | | Victoza | Novo Nordisk | 2010 | $813 (2 pens) $1,220 (3 pens) |
| | | Ozempic | Novo Nordisk | 2017 | $1,022 (pens) |

**B.      The Dramatic Rise in the Price of Diabetes Medications**

235.    In 2003, PBMs began their rise to power (which will be discussed in greater detail in the next section).

236.    That same year, the price of insulin began its dramatic rise to its current exorbitant prices.

237.    Since 2003, the reported price of certain insulins has increased in some cases by more than 1000%; an astounding increase especially when compared to a general inflation rate of  8.3% and a medical inflation rate of 46% in this time period.

238.    By 2016, the average price per month of the four most popular types of insulin rose to $450 — and costs continue to rise, so much so that now one in four diabetics are skimping on or skipping lifesaving doses.[3] This behavior is dangerous to a diabetic's health and can lead to a variety of complications and even death.

239.    Since 1997, Defendant Eli Lilly has raised the price of a vial of Humulin R (500U/ML) from $165 to $1784 (*See* Figure 2).

---

[3] https://jamanetwork.com/journals/jamainternalmedicine/fullarticle/2717499.





Figure 2: Rising reported prices of Humulin R (500U/mL) from 1997-2021

240.   Since 1996, Defendant Eli Lilly has raised the price for a package of pens of Humalog from less than $100 to $663 and from less than $50 for a vial to $342 (*See* Figure 3).



**Figure 3: Rising reported prices of Humalog vials and pens from 1996-2021**

241.   Novo Nordisk has also increased its prices—from 2006 to 2020, Levemir rose from $162 to $555 for pens and from under $100 to $370 per vial (*See* Figure 4).

**Figure 4: Rising reported prices of Levemir from 2006-2021**



242.    From 2002 to 2020, Novo Nordisk raised the price of Novolog from $108 to

$671 for a package of pens and from less than $50 to $347 for a vial (*See* Figure 5).

**Figure 5: Rising reported prices of Novolog vials and pens
from 2002-2021**



243. Defendant Sanofi has kept pace as well, increasing the prices for Lantus, the top-selling analog insulin, from less than $200 in 2006, to over $500 in 2020 for a package of pens and from less than $50 to $340 for a vial (*See* Figure 6).

**Figure 6: Rising reported prices of Lantus vials and pens from 2001-2021**



244. Manufacturer Defendants' non-insulin diabetes medications have experienced similar recent price increases. For example, since 2015 Eli Lilly has increased the price of Trulicity almost 50%.

245. Driven by these price hikes, payors' and diabetics' spending on diabetes medications has skyrocketed with totals in the tens of billions of dollars.

## Defendant Manufacturers Have Increased Prices in Lockstep

246.    The timing of the price increases reveal that each Manufacturer Defendant has not only dramatically increased prices for the at-issue diabetes treatments, they have done so in perfect lockstep.

247.    In thirteen (13) instances since 2009, competitors Sanofi and Novo Nordisk raised the reported prices of their insulins, Lantus and Levemir, in tandem, taking the same price increase down to the decimal point within a few days of each other.

248.    This practice of increasing drug prices in lockstep with competitors is known as "shadow pricing" and, as healthcare expert Richard Evans from SSR Health recently stated, "is pretty much a clear signal that your competitor does not intend to price-compete with you."

249.    In 2016, Novo Nordisk and Sanofi's lockstep increases for the at-issue drugs were responsible for the highest drug price increases in the entire pharmaceutical industry.

250.    Eli Lilly and Novo Nordisk have engaged in the same lockstep behavior with respect to their rapid-acting analog insulins, Humalog and Novolog. Figure 7 demonstrates this collusive behavior with respect to Lantus and Levemir. Figure 8 demonstrates this behavior with respect to Novolog and Humalog.

**Figure 7: Rising reported prices of long-acting insulins**





**Figure 8: Rising reported prices of rapid-acting insulins**

251.    Figure 9 demonstrates this behavior with respect to the human insulins, Eli Lilly's Humulin and Novo Nordisk's Novolin.

**Figure 9: Rising reported price increases for human insulins**



252.    Figure 10 demonstrates Defendants' lockstep price increases for their Type 2 drugs, Trulicity, Victoza and Ozempic.

**Figure 10: Rising reported prices of Type 2 drugs**



253.    Figure 11 shows how, collectively, Manufacturer Defendants have exponentially raised the prices of insulin products in near perfect unison.

## Figure 11: Lockstep insulin price increases



254.    Because of Manufacturer Defendants' collusive price increases, nearly a century after the discovery of insulin, diabetes medications have become unaffordable for many diabetics.

### C.    Pharmaceutical Payment and Supply Chain

255.    The prescription drug industry consists of a deliberately opaque network of entities engaged in multiple distribution and payment structures. These entities include drug manufacturers, wholesalers, pharmacies, health plans/third party payors, pharmacy benefit managers and patients.

256.    Generally speaking, branded prescription drugs, such as the at-issue diabetes medications, are distributed in one of two ways: (1) from manufacturer to wholesaler, wholesaler to pharmacy and pharmacy to patient or (2) from manufacturer to mail order pharmacy to patient.

257.    The pharmaceutical industry, however, is unique in that the pricing chain is distinct from the distribution chain. The prices for the drugs distributed in the

pharmaceutical chain are different for each participating entity: different actors pay different prices set by different entities for the same drugs. The unifying factor is that the price that each entity in the pharmaceutical chain pays for a drug is directly tied to the manufacturer's reported price.

258.    There is no transparency in this pricing system; typically, only a brand drug's reported price—also known as its Average Wholesale Price (AWP) or the mathematically-related Wholesale Acquisition Cost (WAC)—is available.

259.    Drug manufacturers self-report AWP or other prices upon which AWP is based to publishing compendiums such as First DataBank, Redbook and others who then publish that price.

260.    AWP persists as the most commonly and continuously used reported price in reimbursement and payment calculations and negotiations for both payors and patients.

### Drug Costs for Diabetics

261.    Whether insured or not, all Mississippi diabetics pay a substantial part of their diabetic drug costs based on the prices generated by the Insulin Pricing Scheme.

262.    Uninsured diabetic must pay the full, point-of-sale prices (based on prices generated by the Insulin Pricing Scheme) every time they fill their prescriptions. In Mississippi, 12% of the population—or 357,138 Mississippians are uninsured. Approximately 60,000 of uninsured Mississippians are diabetic. As a direct result of the Insulin Pricing Scheme, the prices uninsured Mississippians have had to pay for the at-issue life-sustaining drugs has skyrocketed over the last fifteen years.

263.    The uninsured are not the only patients saddled with high costs. Insured diabetics also often pay a significant portion of a drug's price out-of-pocket including in deductibles, coinsurance requirements, and/or copayment requirements.

264.    Thus, nearly all Mississippi diabetics have been damaged by having to pay for diabetes medications out-of-pocket based upon the specific false prices generated by the Insulin Pricing Scheme. In many cases, the Mississippi diabetics have been priced out of these life-sustaining drugs.

265.    In addition, these exorbitant indefensible out-of-pocket costs make it more difficult for patients to adhere to their medications, resulting in avoidable complications and higher overall healthcare costs. An American Diabetes Association working group recently noted that "people with high cost-sharing are less adherent to recommended dosing, which results in short- and long-term harm to their health." The overall economic impact from the loss of productivity and increased healthcare costs that result from diabetics underdosing on their insulin has been deeply damaging to the State of Mississippi as well.

### D.    PBMs' Role in the Pharmaceutical Payment Chain

266.    PBMs are at the center of the convoluted pharmaceutical payment chain, as illustrated in Figure 12:

**Figure 12: Insulin distribution and payment chain**



267.     The PBM Defendants develop drug formularies, process claims, create a network of retail pharmacies, set the prices in coordination with the Manufacturers that payors pay for prescription drugs and are paid by payors for the drugs utilized by a payor's beneficiaries.

268.     PBMs also contract with a network of retail pharmacies. Pharmacies agree to dispense drugs to patients and pay fees back to the PBMs. PBMs reimburse pharmacies for the drugs dispensed.

269.     PBM Defendants also own mail-order and specialty pharmacies, which purchase and take possession of prescription drugs, including those at-issue here, and directly supply those drugs to patients by mail.

270.     Often times—including for the at-issue drugs—the PBM Defendants purchase drugs directly from the manufacturers and distribute them directly to the patients.

271.   Even where PBM Defendant mail order pharmacies purchase drugs from wholesalers, their costs are set by direct contracts with the manufacturers.

272.   In addition, and of particular significance here, PBM Defendants contract with pharmaceutical manufacturers, including Manufacturer Defendants. PBMs extract from the Manufacturers rebates, fees and the other consideration that are paid back to the PBM (defined herein as Manufacturer Payments).

273.   These relationships allow PBMs to exert tremendous influence over what drugs are available throughout the United States, including in Mississippi, on what terms and at what prices.

274.   Thus, PBMs are at the center of the flow of money in the pharmaceutical supply chain. In sum:

- PBMs negotiate the price that payors pay for prescription drugs (based on prices generated by the Insulin Pricing Scheme);

- they separately negotiate a different (and often lower) price that pharmacies in their networks receive for that same drug;

- they set the amount in fees that the pharmacy pays back to the PBM for each drug sold (based on prices generated by the Insulin Pricing Scheme);

- they set the price paid for each drug sold through their mail order pharmacies (based on prices generated by the Insulin Pricing Scheme); and

- they negotiate the amount that the Manufacturers pay back to the PBM for each drug sold (based on prices generated by the Insulin Pricing Scheme).

275.   Yet, for the majority of these transactions, only the PBMs are privy to the amount that any other entity in this supply chain is paying or receiving for the exact same drugs. This lack of transparency affords Defendants the opportunity to extract billions of dollars from this payment and supply chain without detection.

276.   In every interaction that PBMs have within the pharmaceutical pricing chain they stand to profit from the prices generated by the Insulin Pricing Scheme.

### The Rise of the PBMs in the Pharmaceutical Supply Chain

277.   When they first came into existence in the 1960s, PBMs functioned largely as claims processors. Over time, however, they have taken on a larger and larger role in the pharmaceutical industry. Today, PBMs wield significant control over the drug pricing system.

278.   One of the roles PBMs took on, as discussed above, was negotiating with drug manufacturers ostensibly on behalf of payors. In doing so, PBMs affirmatively represented that they were using their leverage to drive down drug prices.

279.   In the early 2000s, PBMs started buying pharmacies.

280.   When a PBM combines with a pharmacy, it has additional incentive to collude with Manufacturers to keep certain prices high.

281.   These perverse incentives still exist today with respect to both retail and mail order pharmacies housed within the PBMs' corporate families.

282.   More recently, further consolidation in the industry has afforded PBMs a disproportionate amount of market power.

283.   In total, nearly forty (40) different PBM entities have merged or otherwise been absorbed into what are now the PBM Defendants.

284.   In addition, each of the PBM Defendants are now owned by other significant players within the pharmaceutical chain: Express Scripts merged with Cigna in a $67 billion-dollar deal, Caremark was bought by the largest pharmacy in the United States, CVS for $21 billion, CVS also now owns Aetna following a $69 billion-dollar deal and

OptumRx was acquired by the largest health insurance company in the United States,

UnitedHealth Group.

285.   Figure 13 depicts this consolidation within the PBM market.

**Figure 13: PBM consolidation**



286.   After merging or acquiring all of their competitors and now backed by multi-

billion-dollar corporations, PBM Defendants have taken over the market in the past

decade—controlling over 75% of the market and managing pharmacy benefits for over 270

million Americans.

287.   Business is booming for PBM Defendants. Together, they report more than

$300 billion in annual revenue.

288.   PBMs are able to use the consolidation in the market as leverage when negotiating with other entities in the pharmaceutical pricing chain. Last year, industry expert Lindsay Bealor Greenleaf from the Advice and Vision for the Healthcare Ecosystem (ADVI) consulting described this imbalance in power, "it's really difficult to engage in any type of fair negotiations when one of the parties has that kind of monopoly power . . . I think that is something that is going to continue getting attention, especially as we see more of these payors and PBMs continue to try to further consolidate."

**Insular Nature of the Pharmaceutical Industry**

289.   The insular nature of the PBM and pharmaceutical industry has provided PBM Defendants with ample opportunity for contact and communication with their competitors, as well as with Manufacturer Defendants, in order to devise and agree to the Insulin Pricing Scheme.

290.   PBM Defendants routinely communicate through direct interaction with their competitors and the Manufacturers at trade associations and industry conferences.

291.   Each year during the relevant time period, the main PBM trade association, the Pharmaceutical Care Management Association ("PCMA"), held several yearly conferences, including its Annual Meeting and its Business Forum conferences.

292.   The current board of the PCMA includes Alan Lotvin, Executive Vice President of PBM Defendant CVS Health and President of CVS Caremark; John Prince, President and COO of PBM Defendant Optum; and Tim Wentworth, CEO of PBM Defendant Evernorth.

293.   All PBM Defendants are members of the PCMA and all Manufacturer Defendants are affiliate members of this organization.

294.   Every year, high-level representatives and corporate officers from both PBM and Manufacturer Defendants attend these conferences to meet in person and engage in discussions, including those in furtherance of the Insulin Pricing Scheme.

295.   In fact, for at least the last six (6) years, all of the Manufacturer Defendants have been "Presidential Sponsors" of these PBM conferences.

296.   Notably, many of the forums at these conferences are specifically advertised as offering opportunities for private, non-public communications. For example, as Presidential Sponsors of these conferences, Manufacturer Defendants each hosted "private meeting rooms" that offer "excellent opportunities for . . . one-on-one interactions between PBM and pharma executives."

297.   In addition, all PCMA members, affiliates and registered attendees of these conferences are invited to join PCMA-Connect, "an invitation-only LinkedIn Group and online networking community." As PCMA members, PCMA-Connect provides PBM and Manufacturer Defendants with a year-round, non-public online forum to engage in private discussions in furtherance of the Insulin Pricing Scheme.

298.   Communications between PBM Defendants are facilitated by the fluidity and frequency with which executives move from one PBM Defendant to another. Representative examples include:

- Mark Thierer worked as an executive at the PBM Medco (now Express Scripts) until he became the CEO of OptumRx in 2016;

- Bill Wolfe was the President of the PBM Catalyst Rx (now OptumRx) prior to becoming the President of Aetna Rx in 2015;

- Duane Barnes was the Vice President of Medco (now Express Scripts) prior to becoming division President of Aetna Rx in 2006;

- Everett Nevill was the division President of Aetna Rx before becoming Senior Vice President of Express Scripts of 2015;

- Albert Thigpen was a Senior Vice President at CVS Caremark prior to becoming a Senior Vice President at OptumRx in 2011;

- Harry Travis was the Chief Operating Officer at Medco (now Express Scripts) before becoming a Vice President at Aetna Rx in 2008; and

- Bill Kiefer was a Vice President of Express Scripts before becoming a Senior Vice President at OptumRx in 2015.

## E.    The Insulin Pricing Scheme

299.    The market for the at-issue diabetes medications is unique in that it is highly concentrated with little to no generic/biosimilar options and the drugs have similar efficacy and risk profiles.    These qualities should afford the PBMs great leverage in negotiating with the Manufacturer Defendants for formulary placement.    In such a scenario, competition should drive prices down.

300.    But the PBMs do not want the prices for diabetes medications to go down because they make more money on higher prices (as explained in detail below). So do the Manufacturers.

301.    As a result, Defendants have found a way to game the system for their mutual benefit—the Insulin Pricing Scheme. Both sets of Defendants realized that if the Manufacturers artificially inflate the reported prices, while at the same time paying large, undisclosed Manufacturer Payments back to the PBMs, both the PBMs and Manufacturers could make billions.  The plan worked.

302.    Over the course of the last fifteen years the Manufacturers have raised their prices exponentially and paid larger and larger amounts of Manufacturer Payments back to the PBMs.

303.    In exchange for the Manufacturers' artificially inflating their prices and paying the PBMs substantial amounts in Manufacturer Payments, PBM Defendants grant

Manufacturer Defendants' diabetes medications with the most elevated price and the highest Manufacturer Payment amount preferred status on their national formularies.

304.   Manufacturer Defendants know that these PBM Defendants dominate the pharmacy benefit market.  The Manufacturers also know that because of this market dominance, the majority of payors, including in Mississippi, accept the baseline national formularies offered by the PBMs with respect to the at-issue drugs.

305.   For example, Olivier Brandicourt, Sanofi's Chief Executive Officer, in a recent interviewed stressed the importance of the PBMs' national formularies: "if you look at the way [CVS Caremark] is organized in the U.S . . . 15 million [lives] are part of [CVS Caremark's] national formulary and that's very strict, all right. So, [if we were not included in CVS Caremark's national formulary] we wouldn't have access to those 15 million lives."

306.   Consequently, the Manufacturer Defendants raise their prices as a direct result of the national negotiations and agreements with these three PBM Defendants.

307.   Thus—and contrary to their public representations—the PBM Defendants' negotiations and agreements with the Manufacturer Defendants (and the formularies that result from these agreements) are incentivizing and are responsible for the precipitous price increases for the at-issue diabetes medications.

308.   As a result of the Insulin Pricing Scheme, every diabetic and payor that pays for and/or reimburses for the at-issue drugs has been fraudulently overcharged.

309.   Importantly, the Insulin Pricing Scheme is a coordinated effort between the Manufacturer and PBM Defendants, that each agreed to and participated in and that created enormous profits for all of the Defendants.  For example:

- Manufacturers and PBMs are in constant communication and regularly meet and exchange information to construct and refine the PBM formularies that fuel the scheme. As part of these communications, the Manufacturers

are directly involved in determining not only where their own diabetes medications are placed on the PBMs' formularies and with what restrictions, but also determining the same for competing products;

- Manufacturers and PBMs share confidential and proprietary information with each other in furtherance of the Insulin Pricing Scheme, such as market data gleaned from the PBMs' drug utilization tracking efforts and mail order pharmacy claims, internal medical efficacy studies and financial data. Defendants then use this information in coordination to set the prices for the at-issue medications and construct their formularies in the manner that is most profitable for both sets of Defendants. The data that is used to further this coordinated scheme is compiled, analyzed and shared either by departments directly housed within the PBM or by subsidiaries of the PBM, as is the case with OptumRx which utilizes Optum Insight and Optum Analytics; and

- Manufacturers and PBMs engage in coordinated outreach programs directly to patients, pharmacies and prescribing physicians to convince them to switch to the diabetes medications that are more profitable for the PBMs and Manufacturers, even drafting and editing letters in tandem to send out to diabetes patients on behalf of the PBMs' clients.

310.    Far from using their prodigious bargaining power to lower drug prices as they claim, Defendants use their dominant positions to work together to generate billions of dollars at the expense of Mississippi diabetics and the State.

### F.    Defendants Admit That They Have Engaged in The Insulin Pricing Scheme and That It Is Harming Diabetics

311.    On April 10, 2019, the United States House of Representatives Committee on Energy and Commerce held a hearing on Defendants' Insulin Pricing Scheme titled, "Priced Out Of A Lifesaving Drug: Getting Answers on the Rising Cost of Insulin."[4]

312.    Representatives from all Defendants testified at the hearing and each acknowledged before Congress that the price for insulin has increased exponentially in the past fifteen (15) years.

---

[4] https://www.congress.gov/event/116th-congress/house-event/109299?s=1&r=3.

313.   Further, each Defendant explicitly admitted that the price that diabetics have to pay out-of-pocket for insulin is too high. For example:

- Dr. Sumit Dutta, Chief Medical Officer of OptumRx stated, "A lack of meaningful competition allows the [M]anufacturers to set high [reported] prices and continually increase them which is odd for a drug that is nearly 100 years old and which has seen no significant innovation in decades. These price increases have a real impact on consumers in the form of higher out-of-pocket costs."

- Thomas Moriarty, Chief Policy and External Affairs Officer and General Counsel for CVS Health testified, "A real barrier in our country to achieving good health is cost, including the price of insulin products which are too expensive for too many Americans. Over the last several years, [reported] prices for insulin have increased nearly 50 percent. And over the last ten years, [reported] price of one product, Lantus, rose by 184 percent."

- Mike Mason, Senior Vice President of Eli Lilly when discussing how much diabetics pay out-of-pocket for insulin stated "it's difficult for me to hear anyone in the diabetes community worry about the cost of insulin. Too many people today don't have affordable access to chronic medications . . ."

- Kathleen Tregoning, Executive Vice President External Affairs at Sanofi, testified, "Patients are rightfully angry about rising out-of-pocket costs and we all have a responsibility to address a system that is clearly failing too many people. . . we recognize the need to address the very real challenges of affordability . . . Since 2012, average out-of-pocket costs for Lantus have risen approximately 60 percent for patients . . ."

- Doug Langa, Executive Vice President of Novo Nordisk, stated, "On the issue of affordability . . . I will tell you that at Novo Nordisk we are accountable for the [reported] prices of our medicines. We also know that [reported] price matters to many, particularly those in high-deductible health plans and those that are uninsured."

314.   Notably, none of the testifying Defendants claimed that the significant increase in the price of insulin was related to competitive factors such as increased costs or improved clinical benefit.

315.   None of the Defendants pointed to any other participant in the pharmaceutical pricing chain as responsible for the exorbitant price increases for these

diabetes medications—nor could they—for these Defendants collectively are solely responsible for the price of almost every single vial of insulin sold in the United States.

316.   Defendants admitted that they agreed to and did participate in the Insulin Pricing Scheme and that the rise in prices was a direct result of the scheme.

317.   For example, at the April 2019 Congressional hearing Novo Nordisk's President, Doug Langa, explained Novo Nordisk's and PBM Defendants' role in perpetuating the "perverse incentives" of the Insulin Pricing Scheme:

> [T]here is this perverse incentive and misaligned incentives (in the insulin pricing system) and this encouragement to keep [reported] prices high. And *we've been participating in that system* because the higher the [reported] price, the higher the rebate . . . There is a significant demand for rebates. We spend almost $18 billion in rebates in 2018 . . . [I]f we eliminate all the rebates . . . we would be in jeopardy of losing [our formulary] positions. (emphasis supplied)

318.   Eli Lilly, too, has admitted that it raises reported prices as a *quid pro quo* for formulary positions. At the April 2019 Congressional hearing, Mike Mason, Senior Vice President of Eli Lilly testified:

> Seventy-five percent of our [reported] price is paid for rebates and discounts to secure [formulary position] . . . $210 of a vial of Humalog is paid for discounts and rebates. . . We have to provide rebates [to PBMs] in order to provide and compete for [formulary position].

319.   Sanofi has also conceded its participation in the Insulin Pricing Scheme. When testifying at the April 2019 Congressional hearing, Kathleen Tregoning, Executive Vice President for External Affairs of Sanofi, testified:

> The rebates are how the system has evolved. . . I think the system became complex and rebates generated through negotiations with PBMs are being used to finance other parts of the healthcare system and not to lower prices to the patient.

320.   PBM Defendants also admitted at the April 2019 Congressional hearing that they grant preferred, or even exclusive, formulary position because of higher Manufacturer Payments paid by Manufacturer Defendants.

321.   Amy Bricker, Senior Vice President of Express Scripts, when asked to explain why Express Scripts did not grant an insulin with a lower reported price preferred formulary status, answered, "Manufacturers do give higher [payments] for exclusive [formulary] position . . ."

322.   While all of the Defendants acknowledged their participation in the Insulin Pricing Scheme before Congress, in an effort to avoid culpability for the precipitous price increase each Defendant group pointed the finger at the other as the more responsible party.

323.   PBM Defendants specifically testified to Congress that Manufacturer Defendants are solely responsible for their reported price increases and that the Manufacturer Payments that the PBMs receive are not correlated to rising insulin prices.

324.   This statement is objectively false. A February 2020 study by the Leonard D. Schaeffer Center for Health Policy & Economics at the University of South California titled "The Association Between Drug Rebates and List Prices," found that an increase in the amount that the Manufacturers pay back to the PBMs is directly correlated to an increase in prices—on average, a $1 increase in Manufacturer Payments is associated with a $1.17 increase in price—and that reducing or eliminating Manufacturer Payments could result in lower prices and reduced out-of-pocket expenditures.

325.   Further, in large part because of the increased reported prices, and related Manufacturer Payments, PBMs profit per prescription has grown exponentially over the same time period that insulin prices have been increasing. By way of example, since 2003

Defendant Express Scripts has seen its profit per prescription increase over 500 percent per adjusted prescription.

326.   The Manufacturers, on the other hand, argued before Congress that the PBMs were to blame for high insulin prices because of their demands for higher Manufacturer Payments in exchange for formulary placement. As a result, the Manufacturers argue, they have not been profiting off insulin due to declining net prices of these drugs.

327.   However, that also is not true. A 2020 study by JAMA recently published in the *Wall Street Journal* provides data suggesting that the net prices of branded insulin products have actually increased by 51% in the past ten years.

328.   In addition, a 2020 study from the Institute of New Economic Thinking titled, "Profits, Innovation and Financialization in the Insulin Industry," demonstrates that Manufacturer Defendants are still making vast profits from the sale of insulin products regardless of any Manufacturer Payments they are sending back to the PBMs. During the same time period when insulin price increases were at their steepest, distributions to Manufacturers' shareholders in the form of cash dividends and share repurchases totaled *$122 billion*. In fact, during this time period the Manufacturers spent a significantly lower proportion of profits on research and development compared to shareholder payouts.

329.   The truth is—despite their finger pointing in front of Congress— Manufacturers and PBMs are both responsible for their concerted efforts in creating the Insulin Pricing Scheme. This reality was echoed in the statement from the bipartisan

investigation conducted by the Senate Finance Committee, in January 2021, summarizing

Congress's findings of their two-year probe into the Insulin Pricing Scheme[5]:

> [M]anufacturers and [PBMs] have created a vicious cycle of price increases
> that have sent costs for patients and taxpayers through the roof . . . This
> industry is anything but a free market when PBMs spur drug makers to hike
> list prices in order to secure prime formulary placement and greater rebates
> and fees.

### G.   Defendants Profit Off the Insulin Pricing Scheme

330.   For Manufacturer Defendants, the Insulin Pricing Scheme affords them the

ability to pay the PBM Defendants significant, yet undisclosed, Manufacturer Payments in

exchange for formulary placement—which garners Manufacturer Defendants greater

revenues from sales—without decreasing their profit margins. During the relevant time

period, PBM Defendants granted national formulary position to each at-issue drug in

exchange for large Manufacturer Payments and inflated prices.

331.   Manufacturer Defendants also use the inflated price to earn hundreds of

millions of dollars in additional tax breaks by basing their deductions for donated insulins

on the inflated reported price.

332.   PBM Defendants profit off the artificially inflated prices created by the

Insulin Pricing Scheme in a myriad of ways, including (1) retaining a significant—yet

undisclosed—percentage of the Manufacturers Payments, (2) using the inflated reported

price to generate profits from pharmacies and (3) relying on the inflated reported price to

drive up the PBMs' margins through their own mail order pharmacies.

---

[5] https://www.finance.senate.gov/imo/media/doc/Grassley-
Wyden%20Insulin%20Report%20(FINAL%201).pdf

## PBMs Pocket a Majority of Manufacturers' Secret Payments

333.   The first way in which the PBMs profit off the Insulin Pricing Scheme is by keeping a significant portion of the secret Manufacturer Payments.

334.   The amount that the Manufacturers pay back to the PBMs has accelerated to represent a large percentage of the reported price of diabetes medications.

335.   Historically, when PBMs contracted with payors, the contract allowed the PBM to keep all or at least some of the Manufacturer Payments they received, rather than pass them along to the payor.

336.   Over time, payors have secured contract provisions guaranteeing them all or some portion of the "rebates" paid by the Manufacturers to the PBMs. But—critically— "rebates" are only a portion of the total secret Manufacturer Payments.

337.   In this regard, PBM and Manufacturer Defendants have created a "hide-the-ball" system where the consideration exchanged between them (and not shared with payors) is labeled and relabeled. As more payors moved to contracts that require PBMs to pass a majority of the manufacturer "rebates" through to the payor, PBMs have begun renaming the Manufacturer Payments in order to keep a larger portion of this money. Payments once known as "rebates" are now called administrative fees, volume discounts, service fees, inflation fees or other industry jargon terms designed to obfuscate and distract from the substantial sums being secretly exchanged.

338.   And these renamed secret Manufacturer Payments are indeed substantial. A recent heavily redacted complaint filed by Defendant Express Scripts revealed that *Express Scripts now retains up to 13 times more in "administrative fees" than it passes through to payors in formulary rebates.*

339.   In addition, the PBMs have come up with numerous ingenious methods to hide these renamed Manufacturer Payments in order keep them for themselves.

340.   For example, with regards to the Manufacturer Payments now known as "inflation fees," the PBMs often create a hidden gap between how much the Manufacturers pay them to increase their prices and the amount in "price protection guarantees" that the PBMs agree to pay back to their client payors.

341.   In particular, the Manufacturer Defendants often pay the PBM Defendants "inflation fees" in order to increase the price of their diabetes medications.  The thresholds for these payments are typically set around 6% to 8%—if the Manufacturer Defendants raise their prices by more than 6% (or 8%) during a specified time period they pay the PBM Defendants an additional "inflation fee" (based on a percentage of the reported prices).

342.   For many of their clients, the PBMs have separate "price protection guarantees" that state that if the overall drug prices for that payor increase by more than a set amount, then the PBMs will revert a portion of that amount back to these clients.

343.   The PBMs set these "price protection guarantees" at a higher rate than the thresholds that trigger the Manufacturers' "inflation fees," usually around 10%-15%.

344.   If the Manufacturers increase their reported prices more than the 6% (or 8%) inflation fee rate but less than the 10%-15% client price protection guarantee rate, then the PBMs keep 100% of these "inflation fee" payments.   This is a win-win for the Manufacturers and PBMs—they get to mutually retain and share all of the benefit of these price increases.

345.   Another method that the PBMs have devised to hide the renamed Manufacturer Payments is through the use of "rebate aggregators."

346.   Rebate aggregators, sometimes referred to as rebate group purchasing organizations ("GPOs"), are entities that negotiate for and collect payments from drug manufacturers, including the Manufacturer Defendants, on behalf of a large group of pharmacy benefit managers (including the PBM Defendants) and different entities that contract for pharmaceutical drugs.

347.   These rebate aggregators are often affiliated with or owned by the PBM Defendants, such as Ascent Health Services (Express Scripts), Coalition for Advanced Pharmacy Services and Emisar Pharma Services (OptumRx) and Zinc (CVS Caremark).

348.   The PBMs carefully guard the revenue streams from their rebate aggregator activities, hiding them in complex contractual relationships and not reporting them separately in their quarterly SEC filings.

349.   Certain rebate aggregator companies are located offshore, for example, in Switzerland (Express Scripts' Ascent Health) or in Ireland (Emisar Pharma Services), making oversight even more difficult.

350.   The January 2021 Senate Report summarizing Congress's findings of their two-year probe into the Insulin Pricing Scheme contained the following observation on these rebate aggregators:

> [I]t is noteworthy that industry observers have suggested that the recent partnership between Express Scripts and Prime Therapeutics may serve as a vehicle to avoid increasing legislative and regulatory scrutiny related to administrative fees by channeling such fees through a Swiss-based group purchasing organization (GPO), Ascent Health. While there are several regulatory and legislative efforts underway to prohibit manufacturers from paying administrative fees to PBMs, there is no such effort to change the GPO safe harbor rules. New arrangements used by PBMs to collect fees should be an area of continued investigative interest for Congress.

351. Because the PBMs are able to hide (and retain) a majority of the secret Manufacturer Payments that they receive, they are able to make significant profits on the Insulin Pricing Scheme.

352. Even in the rare cases where certain sophisticated payor clients receive a portion of the Manufacturer Payments from their particular pharmacy benefit manager (whether it is a PBM Defendant or not), those payors are still significantly overcharged as a direct result of the Insulin Pricing Scheme given the extent to which Defendants have fraudulently and egregiously inflated the prices of the at-issue drugs.

### Insulin Pricing Scheme Allows PBMs To Profit Off Pharmacies

353. A second way that PBM Defendants profit off the Insulin Pricing Scheme is by using the inflated price generated by the scheme to profit off the pharmacies with whom they contract.

354. PBM Defendants decide which pharmacies are included in the PBM's network and how much they will reimburse these pharmacies for each drug dispensed.

355. PBMs pocket the spread between the amount that the PBMs get paid by their clients for the at-issue drugs (which are based on the prices generated by the Insulin Pricing Scheme) and the amount the PBM reimburses the pharmacy (which is often less).

356. PBMs do not disclose to their clients or network pharmacies how much the PBM is receiving from or paying to the other.

357. This spread pricing, like the secret Manufacturer Payment negotiation, happens behind closed doors. There is no transparency, no commitment from PBM Defendants to take into account the cost effectiveness of a drug and no communication to either the payor or the pharmacy to let them know if they are getting a fair deal.

358.   The higher the Manufacturers inflate their prices, the more money the PBMs make off this spread.

359.   PBMs also use the Insulin Pricing Scheme to generate additional profits from pharmacies by charging the pharmacies post-purchase fees, including DIR fees, based on the reported prices—and again, the higher the reported price for each diabetes medication sold, the more the PBMs generate in these pharmacy fees.

## Insulin Pricing Scheme Increases PBM Mail Order Profits

360.   A third way PBMs profit off the Insulin Pricing Scheme is through the PBM Defendants own mail order pharmacies. The higher the price that PBM Defendants are able to get their customers, such as Mississippi diabetics and the State, to pay for diabetes medications, the higher the profits PBM Defendants realize through their mail order pharmacies.

361.   Because the PBMs base the price they charge for the at-issue diabetes medications on the reported price, the more the Manufacturers inflate their prices, the more money the PBMs make.

362.   PBMs also charge the Manufacturer Defendants fees related to their mail order pharmacies, such as pharmacy supplemental discount fees, that are directly tied to the reported price.  Thus, once again, the higher the price is, the more money the PBMs make on these fees.

363.   In sum, every way that the PBMs make money on diabetes medications is directly tied to creating higher prices and inducing larger secret Manufacturer Payments. PBMs are not lowering the price of diabetes medications as they publicly represent—rather they are making billions of dollars by fueling these skyrocketing prices.

**H.    Defendants Deceived Diabetic Mississippians and the State of Mississippi**

364.    At no time have either Defendant group disclosed the Insulin Pricing Scheme.

## Manufacturer Defendants Deceived the State and Mississippi Diabetics

365.    At all times during the relevant period, Manufacturer Defendants knew that the prices generated by the Insulin Pricing Scheme were completely false and untethered to any legal, competitive or fair market price.

366.    The Manufacturer Defendants knew that these prices did not bear a reasonable relationship to the actual prices realized by Defendants, did not result from transparent market forces and were artificially and arbitrarily inflated for the sole purpose of generating profits for the Manufacturer and PBM Defendants.

367.    Manufacturer Defendants also knew that payors, like the State of Mississippi, and diabetic Mississippians pay for the at-issue medications based on the Manufacturers' prices.

368.    Despite this knowledge, Manufacturer Defendants published the prices generated by the Insulin Pricing Scheme throughout the United States and Mississippi through publishing compendia, in various promotional and marketing materials distributed by entities downstream in the drug supply chain and directly to pharmacies who then used these prices to set the amount that the pharmacies charged for the at-issue drugs. Manufacturer Defendants also publish these prices to the PBMs and pharmacies who then use the prices to set the amount payors, like the State of Mississippi, pay for the at-issue drugs.

369.   Manufacturer Defendants affirmatively withheld the truth from Mississippi diabetics and the State and specifically made these misrepresentations to induce reliance by payors, including the State, as well as by diabetics in purchasing their diabetes medications.

### PBM Defendants Deceived the State and Mississippi Diabetics

370.   PBM Defendants have deceived the State of Mississippi and diabetic Mississippians.

371.   At all times throughout the relevant period, PBMs have purposefully, consistently and routinely misrepresented that they negotiate with Manufacturer Defendants and construct formularies for the benefit of payors and patients by lowering the price of the at-issue drugs and by promoting the health of diabetics.  Representative examples include:

- In every annual report for at least the past ten years, Defendant CVS Caremark has consistently stated that its design and administration of formularies are aimed at reducing the costs and improving the safety, effectiveness and convenience of prescription drugs.

- In every annual report for at least the past ten years, CVS Caremark has stated that it maintains an independent panel of doctors, pharmacists and other medical experts to review and approve the selection of drugs based on safety and efficacy for inclusion on one of Caremark's template formularies and that CVS Caremark's formularies lower the cost of drugs.

- In every annual report for at least the past ten years, Defendant Express Scripts has consistently represented that it works with clients, manufacturers, pharmacists and physicians to increase efficiency in the drug distribution chain, to manage costs in the pharmacy benefit chain and to improve members' health outcomes.

- In every annual report for at least the past ten years, Express Scripts has further represented that in making formulary recommendations, Express Scripts' Pharmacy & Therapeutics Committee considers the drug's safety and efficacy, without any information on or consideration of the cost of the drug, including any discount or rebate arrangement that Express Scripts negotiates with the Manufacturer, and that Express Scripts fully complies

with the P&T Committee's clinical recommendations regarding drugs that must be included or excluded from the formulary based on their assessment of safety and efficacy.

- In every annual report for at least the past ten years, Defendant OptumRx has consistently stated that OptumRx's rebate contracting and formulary management assist customers in achieving a low-cost, high-quality pharmacy benefit.

- In every annual report for at least the past ten years, Defendant OptumRx has stated that it promotes lower costs by using formulary programs to produce better unit costs, encouraging patients to use drugs that offer improved value and that OptumRx's formularies are selected for health plans based on their safety, cost and effectiveness.

372.  In addition to these general misrepresentations, throughout the relevant time period, PBM Defendants have purposefully, consistently and routinely made misrepresentations specifically about the at-issue diabetes medications.  Representative examples include:

- In a public statement issued in November 2010, CVS Caremark represented that it was focused on diabetes to "help us add value for our PBM clients and improve the health of plan members . . . a PBM client with 50,000 employees whose population has an average prevalence of diabetes could save approximately $3.3 million a year in medical expenditures."

- In 2010, Andrew Sussman, Chief Medical Officer of CVS Caremark stated on national television that "CVS is working to develop programs to hold down [diabetes] costs."

- In a public statement issued in November 2012, CVS Caremark represented that formulary decisions related to insulin products "is one way the company helps manage costs for clients."

- In 2016, Glen Stettin, Senior Vice President and Chief Innovation Officer at Express Scripts represented in an interview with a national publication that "[d]iabetes is wreaking havoc on patients, and it is also a runaway driver of costs for payors . . . [Express Scripts] helps our clients and diabetes patients prevail over cost and care challenges created by this terrible disease."

    o  Mr. Stettin continued on to represent that Express Scripts "broaden[s] insulin options for patients and bend[s] down the cost curve of what is currently the costliest class of traditional prescription drugs."

- In a 2018 Healthline interview, Mark Merritt, President of the PBM trade association, PCMA, in response to a question about PBMs' role in the insulin pricing system stated, "[Through their formulary construction], PBMs are putting pressure on drug companies to reduce insulin prices."

- CVS Caremark's Chief Policy and External Affairs Officer testified during the April 2019 hearings that, CVS Caremark "has taken a number of steps to address the impact of insulin price increases. We negotiate the best possible discounts off the manufacturers' price on behalf of employers, unions, government programs, and beneficiaries that we serve."

- Chief Medical Officer of OptumRx, testified before the U.S. Congress in the April 2019 hearing that for "insulin products . . . we negotiate with brand manufacturers to obtain significant discounts off list prices on behalf of our customers."

- The PCMA website contains the following misrepresentations, "the insulin market is consolidated, hindering competition and limiting alternatives, leading to higher list prices on new and existing brand insulins. PBMs work hard to drive down costs using formulary management and rebates."

373.    PBM Defendants not only falsely represent that they negotiate with Manufacturer Defendants to lower the price of the at-issue diabetes medications for *payors*, but also for diabetic *patients* as well.  Representative examples include:

- Express Scripts' publicly available code of conduct states, "[a]t Express Scripts we're dedicated to keeping our promises to *patients and clients* . . . This commitment defines our culture, and all our collective efforts are focused on our mission to make the use of prescription drugs safer and more affordable." (emphasis added)

- Amy Bricker, Senior Vice President at Express Scripts testified before Congress in April 2019, "At Express Scripts we negotiate lower drug prices with drug companies on behalf of our clients, *generating savings that are returned to patients* in the form of lower premiums and reduced out-of-pocket costs." (emphasis added)

- Amy Bricker of Express Scripts also testified at the Congressional hearing that "Express Scripts remains committed to . . . *patients* with diabetes and creating affordable access to their medications." (emphasis added)

- OptumRx's website has stated "[t]he services we provide help *improve health outcomes for patients* while making prescription drugs more affordable for plan sponsors and *individuals*, and more sustainable for the

country . . . the reason is simple: drug manufacturers are responsible for the high cost of prescription drugs . . . OptumRx negotiates better prices with drug manufacturers for our customers *and consumers* . . . At OptumRx, *our mission is helping people live healthier lives* and *to help make the health system work better for everyone.* (emphasis added)

- In its 2017 Drug Report, CVS Caremark stated that the goal of its pharmacy benefit plans is to ensure "that the cost of a drug is aligned with the value it delivers in terms of *patient* outcomes . . . in 2018, we are doing even more to help keep drugs affordable with our new Savings *Patients* Money initiative." (emphasis added)

- The PCMA website states, "PBMs have kept average out-of-pocket (OOP) payments flat for beneficiaries with commercial insurance."

374.  Not only have PBM Defendants intentionally misrepresented that they use their market power to save payors and diabetics money, they have specifically, knowingly and falsely disavowed that their conduct drives prices higher. Representative examples include:

- On an Express Scripts' earnings call in February 2017, CEO Tim Wentworth stated, "Drugmakers set prices, and we exist to bring those prices down."

- Larry Merlo, head of CVS Caremark sounded a similar refrain in February 2017, "Any suggestion that PBMs are causing prices to rise is simply erroneous."

- In 2017, Express Scripts' Wentworth went on CBS News to again argue that PBMs play no role in rising drug prices, stating that PBMs work to "negotiate with drug companies to get the prices down."

- During the April 2019 Congressional hearings, when asked if PBM-negotiated rebates and discounts were causing the insulin price to increase, OptumRx's Chief Medical Officer answered, "we can't see a correlation when rebates raise list prices."

- In 2019, when testifying under oath before Congress on the rising price of insulins, Senior Vice President Amy Bricker of Express Scripts testified, "I have no idea why the prices [for insulin] are so high, none of it is the fault of rebates."

375.  Throughout the relevant time period, PBM Defendants' have also misrepresented that they are transparent about the Manufacturer Payments that they

receive and that they pass along (or do not pass along) to payors. As stated above, this representation is false—PBM Defendants retain many times more in total Manufacturer Payments than the traditional formulary "rebates" they may pass through—in whole or part—to payors.

376.    Despite this, in 2011, OptumRx's President stated: "We want our clients to fully understand our pricing structure . . . [e]veryday we strive to show our commitment to our clients, and one element of that commitment is to be open and honest about our pricing structure."

377.    In a 2017 CBS News interview, Express Scripts' CEO, represented, among other things, that Express Scripts "absolutely transparent" about the Manufacturer Payments they receive and that payors, "know exactly how the dollars flow" with respect to these Manufacturer Payments.

378.    When testifying before Congress in April 2019, Amy Bricker, Senior Vice President of Defendant Express Scripts had the following exchange with Representative John Sarbanes of Maryland regarding the transparency (and lack thereof) of the Manufacturer Payments:

> Ms. Bricker. The rebate system is 100 percent transparent to the plan sponsors and the customers that we service. To the people that hire us, employers of America, the government, health plans, what we negotiate for them is transparent to them. . . [However] the reason I'm able to get the discounts that I can from the manufacturer is because it's confidential [to the public].
>
> Mr. Sarbanes. What about if we made it completely transparent? Who would be for that?
>
> Ms. Bricker. Absolutely not . . . it will hurt the consumer.
>
> Mr. Sarbanes. I don't buy it.
>
> Ms. Bricker – prices will be held high.

Mr. Sarbanes. I am not buying it. I think a system has been built that allows for gaming to go on and you have all got your talking points. Ms. Tregoning [of Sanofi], you have said you want to guarantee patient access and affordability at least ten times, which is great, but there is a collaboration going on here . . . the system is working for both of you at the expense of the patient. Now I reserve most of my frustration for the moment in this setting for the PBMs, because I think the lack of transparency is allowing for a lot of manipulation. I think the rebate system is totally screwed up, that without transparency there is opportunity for a lot of hocus-pocus to go on with the rebates. Because the list price ends up being unreal in certain ways except to the extent that it leaves certain patients holding the bag, then the rebate is negotiated, but we don't know exactly what happens when the rebate is exchanged in terms of who ultimately benefits from that. And I think we need more transparency and I do not buy the argument that the patient is going to be worse off, the consumer is going to be worse off if we have absolute transparency . . . *I know when you started out, I understand what the mission was originally with the PBMs . . . But now things have gotten out of control. You are too big and the lack of transparency allows you to manipulate the system at the expense of the patients.* So I don't buy the argument that the patient and consumer is going to get hurt if we have absolute transparency. (emphasis added)

379.    Moreover, in at least, 2005, 2010, 2015 and 2020, each PBM Defendant directly misrepresented to the State that it constructs formularies and negotiates with the Manufacturer Defendants for the benefit of payors and patients by lowering the price of the at-issue drugs and by promoting the health of diabetics.

380.    All these representations are patently false—the Manufacturer and PBM Defendants' coordinated conduct in publishing their prices and negotiating for and constructing their formularies created the Insulin Pricing Scheme and caused the price of the at-issue drugs to skyrocket.

381.    Defendants' coordinated conduct also did not promote the health of diabetics. Contrary to their representations, as a result of Defendants' conduct many diabetics have been priced out of these life-sustaining medications. As discussed further below, the impact of this has been severe—and in some cases fatal.

382.    Defendants knew that these representations were false when they made them and affirmatively withheld this truth from the State and from diabetic Mississippians.

383.    Defendants concealed the falsity of these representations by closely guarding their pricing structures, agreements and sales figures.

384.    Manufacturer Defendants do not disclose to payors or the public their actual prices they receive for the at-issue drugs or the amount in Manufacturer Payments they offer to and pay to the PBM Defendants.

385.    PBM Defendants do not disclose the details of their agreements with Manufacturer Defendants or the Manufacturer Payments they receive from them—nor do they disclose the details related to their agreements with payors and pharmacies.

386.    Further, the PBMs agreements with their clients regarding how much of the Manufacturer Payments that they will pass through to their clients are negotiated in an aggregate amount over all drugs purchased, not on an individual drug-by-drug basis. Thus, payors, like the State, have no way of determining how much of the Manufacturer Payments they receive for any particular drug.  This allows the PBM to hide the large Manufacturer Payments that they receive for the at-issue diabetes medications.

387.    PBM Defendants have gone as far as suing governmental entities to block the release of details on their pricing agreements with Manufacturers and pharmacies.

388.    Even when audited by payors, PBM Defendants often still refuse to disclose their agreements with Manufacturers and pharmacies, relying on overly broad confidential agreements, claims of trade secrets and other unnecessary restrictions.

389.    To make matters worse, Mississippi diabetics, and diabetic beneficiaries of the State's health plans, institutions and programs, have no choice but to pay Defendants'

egregiously inflated prices because they need these medications to survive, and Manufacturer Defendants make virtually all of the diabetes medications available in the United States.

390.   Diabetic Mississippians and the State relied on these misrepresentations in paying for the at-issue diabetes medications at Defendants' egregiously inflated prices.

### I.   The Insulin Pricing Scheme Has Damaged the State of Mississippi and Diabetic Mississippians

#### The Insulin Pricing Scheme Has Damaged the State

391.   Defendants' Insulin Pricing Scheme has cost the State of Mississippi hundreds of millions of dollars in overcharges.

392.   The State of Mississippi has been directly damaged by the Insulin Pricing Scheme as a payor/purchaser of Defendants' at-issue diabetes medications.

393.   With regards to its employee health plans, the State serves almost 3 million residents providing public safety, emergency management and health services just to name a few vital roles.

394.   As an employer, the State provides health benefits to state employees, retirees and their dependents ("Beneficiaries").

395.   One of the benefits that the State's employee health plans offer its Beneficiaries is paying a significant portion of their prescription drug purchases.

396.   The State pays for the at-issue drugs based on the reported prices. Importantly, the State does not negotiate price on an individual drug basis. Rather, the State pays set rates that apply for all drugs (including the at-issue drugs).

397.   In negotiating drug prices, the State understands that there is some inflation in the reported price. Thus, during the relevant time period, the State has negotiated

somewhere between a 15%-18% discount off the reported price for every brand drug purchased.

398.   Importantly, because of Defendants' success in hiding the Insulin Pricing Scheme, no payor, including the State, has any idea that the prices for these particular at-issue diabetes medications are the result of this scheme and far exceed the 15-18% discounts referenced above.

399.   As a result, despite paying a negotiated discount off the Manufacturers' reported price, the State has been unknowingly overpaying millions of dollars every year for Manufacturer Defendants' diabetes medications.

400.   In addition, the State also spends millions of dollars a year purchasing pharmaceutical drugs, including the at-issue diabetes medications that are administered in state-run facilities.   All of these purchases have likewise been impacted by the Insulin Pricing Scheme described herein, causing the State millions of dollars of harm.

401.   Thus, the Insulin Pricing Scheme has directly and proximately caused the State to substantially overpay for diabetes medications.

402.   Because Defendants continue to generate exorbitant, unfair and deceptive prices for the at-issue drugs through the Insulin Pricing Scheme, the harm to the State is ongoing.

### The Insulin Pricing Scheme Has Damaged Mississippi Diabetics

403.   PBM and Manufacturer Defendants have exploited the drug pricing and payment system to extract billions in profits at the expense of Mississippi diabetics.

404.   As discussed above, Mississippi diabetics have been damaged by Defendants' Insulin Pricing Scheme by having to pay at least a portion of their at-issue

purchases out-of-pocket based on Defendants' prices generated by the Insulin Pricing Scheme.

405.   If Defendants' prices were not fraudulently inflated as a result of the Insulin Pricing Scheme each of the above-described diabetic Mississippians would have paid significantly less for the at-issue diabetes medications during the relevant time period. Diabetic Mississippians have been overcharged by millions of dollars as a result of the Insulin Pricing Scheme.

406.   In addition to financial losses, for many diabetic Mississippians, the Insulin Pricing Scheme has cost them their health and emotional well-being. Unable to afford Defendants' price increases, many diabetics in Mississippi have begun to engage in highly risky behaviors with respect to their disease such as rationing their insulin, skipping their refills, injecting expired insulin, reusing needles, and avoiding doctors' visits. To compensate for their lack of insulin, some patients starve themselves, foregoing one or even two meals a day. These practices—which ineffectively control blood sugar levels—can lead to serious complications such as kidney disease and failure, heart disease and heart attacks, infection, amputation, and blindness.

407.   Even when diabetics can still afford their diabetic medications, as a direct result of PBM Defendants shifting which diabetes medications are favored on their formularies, diabetics are often forced to switch medications every few years or go through a lengthy appeal process (or try the favored drug first) before receiving the patient's preferred medication.

408.   Switching diabetic mediations can be detrimental to a diabetics' health including, negatively impacting their blood sugar control for months causing dizziness, blurred vision, weakness, fainting and shakiness.

409.   The Insulin Pricing Scheme has pushed, and will continue to push, access to these lifesaving drugs out of reach for many diabetes patients in Mississippi.

410.   Because Defendants continue to generate exorbitant unfair and deceptive prices for the at-issue drugs through the Insulin Pricing Scheme, the harm to Mississippi diabetics is ongoing.

## J.   Defendants' Recent Efforts to Address Insulin Pricing Falls Far Short of Addressing the Problem

411.   In reaction to the mounting political and public outcry, Defendants recently have begun introducing programs ostensibly aimed at lowering the cost of insulins.

412.   These affordability measures fail to address the structural issues that have given rise to the price hikes. Rather, these steps are merely public relations stunts that do not solve the problem.

413.   For example, in March 2019, Defendant Eli Lilly announced that it would produce an authorized generic version of Humalog, "Insulin Lispro," and promised that it would "work quickly with supply chain partners to make [the authorized generic] available in pharmacies as quickly as possible."

414.   However, in the months after Eli Lilly's announcement, reports raised questions about the availability of "Insulin Lispro" in local pharmacies.

415.   Following this the staff of the Offices of U.S. Senators Elizabeth Warren and Richard Blumenthal prepared a report examining the availability of this drug.[6]  The investigative report, *Inaccessible Insulin: The Broken Promise of Eli Lilly's Authorized Generic*, concluded that Eli Lilly's lower-priced, authorized generic insulin is widely

---

[6] https://www.fdanews.com/ext/resources/files/2019/12-16-19-InaccessibleInsulinreport.pdf?1576536304.

unavailable in pharmacies across the country, and that the company has not taken meaningful steps to increase insulin accessibility and affordability.

416. The conclusion of the report was that: "Eli Lilly has failed to deliver on its promise to put a more-affordable insulin product on the shelves. Instead of giving patients access to its generic alternative, this pharmaceutical behemoth is still charging astronomical prices for a drug people require daily and cannot live without."

417. In 2019, Novo Nordisk partnered with Walmart to offer ReliOn brand insulins for a discounted price at Walmart. However, experts have warned that the Walmart/Novo Nordisk insulins are not substitutes for most diabetics' regular insulins and should only be used in an emergency or when traveling. In particular, for many diabetics, especially Type 1 diabetics, these insulins can be dangerous. In fact, in August 2019, a Type 1 diabetic who could no longer afford his $1,200 a month insulin prescription died months after switching to ReliOn brand insulin due to complications from the disease.

418. Thus, Defendants' "lower priced" insulin campaigns have not addressed the problem. Mississippi diabetics and the State of Mississippi continue to suffer great harm as a result of the Insulin Pricing Scheme.

## VI. TOLLING OF STATUTE OF LIMITATIONS

419. Plaintiff State of Mississippi is not subject to any applicable statute of limitations.

420. Even assuming, *arguendo*, that the State were subject to applicable statutes of limitations, in the alternative, the State asserts that it diligently pursued and investigated the claims asserted in this Second Amended Complaint. Through no fault of its own, the State did not receive inquiry notice nor learn of the factual basis for its claims

in this Second Amended Complaint and the injuries suffered therefrom until recently. Consequently, the following tolling doctrines apply.

### A.   Discovery Rule Tolling

421.   The State had no way of knowing about the Insulin Pricing Scheme.

422.   As discussed above, PBM and Manufacturer Defendants refused to disclose the actual prices of diabetes medications realized by Defendants, the details of the Defendants' negotiations and payments between each other or their pricing structures and agreements—labeling them trade secrets and protecting them with confidentiality agreements.

423.   Each Defendant group also affirmatively blamed the other for the price increase described herein, both during their congressional testimonies and through the media.

424.   The State did not discover and did not know of facts that would have caused a reasonable person to suspect, that Defendants were engaged in the Insulin Pricing Scheme, nor would a reasonable and diligent investigation have disclosed the true facts.

425.   Even today, lack of transparency in the pricing of diabetes medications and the arrangements, relationships and agreements between and among Manufacturer Defendants and PBM Defendants that result from the Insulin Pricing Scheme continue to obscure Defendants' unlawful conduct from the State.

426.   For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims identified herein.

### B.    Fraudulent Concealment Tolling

427.    Any applicable statutes of limitation have also been tolled by the Defendants' knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action, as described above.

### C.    Estoppel

428.    Defendants were under a continuous duty to disclose to the State the true character, quality and nature of the prices upon which payments for diabetes medications were based, and the true nature of the services being provided.

429.    Based on the foregoing, Defendants are estopped from relying on any statutes of limitations in defense of this action.

### D.    Continuing Violations

430.    Any applicable statutes of limitations are also tolled because Defendants' activities have not ceased and still continue to this day and thus any causes of action are not complete and do not accrue until the tortious and anticompetitive acts have ceased.

## VI.    Claims for Relief

### First Cause of Action
### Mississippi Consumer Protection Act. Miss. Code §§ 75-24-1, *et seq*

### (By the State in its *parens patriae* capacity on behalf of Mississippi diabetics against Defendants)

431.    The State of Mississippi re-alleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs.

432.    The State alleges that conditions precedent to filing this Mississippi Consumer Protection Act claim have been performed or have occurred.

433.    Defendants are "persons" within the meaning of, and subject to, the provisions of the Mississippi Consumer Protection Act, *e.g.*, Miss. Code § 75-24-3(a).

434. By engaging in the Insulin Pricing Scheme, as described herein, Defendants have committed acts of unfair and deceptive trade practices and acts in the conduct of trade or commerce within the State, including in Hinds County, as prohibited by Miss. Code § 75-24-5, directly or indirectly, affecting and causing harm to the people of the State as purchasers of the at-issue drugs.

435. Defendants have repeatedly and willfully engaged in the following conduct, which constitutes a deceptive trade practice and a violation of the Mississippi Consumer Protection Act:

- "[R]epresenting that goods or services have . . . characteristics . . . which they do not have . . ." Miss. Code § 75-24-5(2)(e). In particular:

  o A characteristic of every commodity in Mississippi's economy is its price, which is represented by every seller to every buyer that the product being sold is being sold at a legal, competitive, and fair market value.

  o At no point did Defendants reveal that the prices associated with the lifesaving diabetic treatments at issue herein were not legal, competitive or at fair market value.

  o At no point did Defendants disclose that the prices associated with the at-issue drugs were generated by the Insulin Pricing Scheme.

  o In furtherance of Defendants' fraudulent conspiracy, at least once a year for each year during the relevant time period, Defendants reported and published false prices for each at-issue drug and in doing represented that the reported prices were the actual, legal and fair prices for these drugs and resulted from competitive market forces.

  o In addition, with respect to the PBM Defendants, by granting the at-issue drugs preferred formulary position on their standard formularies— formulary positions that the PBMs represent are reserved for reasonably priced drugs and that are meant to promote the health of diabetics—PBM Defendants knowingly and purposefully utilized the false prices that the PBMs knew were generated by the Insulin Pricing Scheme.

  o By granting the at-issue diabetes medications preferred formulary positions, PBM Defendants ensured that prices generated by the Insulin Pricing Scheme would harm diabetics.

- PBM Defendants also misrepresented that their formularies were promoting the health of diabetic Mississippians.

- Defendants' representations are false, and at all relevant times Defendants knew they were false. Both sets of Defendants knew that the prices they reported and utilized are artificially inflated for the purpose of maximizing profits pursuant to the Insulin Pricing Scheme.

- Defendants also knew that the PBMs' formularies were fueling the precipitous price increases that damaged the financial wellbeing and health of Mississippi diabetics.

- At all times relevant hereto, Defendants affirmatively withheld this truth from diabetic Mississippians even though Defendants knew that the diabetic Mississippians' intention was to pay the lowest possible price for diabetes medications and expectation was to pay a legal, competitive price that resulted from transparent market forces.

- "[M]aking false or misleading statements of fact concerning the reasons for, existence of, or amount of price reductions." Miss. Code § 75-24-5(2)(k).

  - In particular, at all relevant times, PBM Defendants made false and misleading statements concerning the reasons for, existence of, and amount of price reductions by misrepresenting that the Manufacturer Payments that the PBM Defendants receive and the negotiations between the PBMs and the Manufacturers lowers the overall price of diabetes medications and promotes the health of diabetics.

  - At all times relevant hereto, these representations were false and Defendants knew they were false when they made them. At all relevant times, PBM Defendants knew that the Manufacturer Payments and the PBMs' negotiations with the Manufacturers were not reducing the overall price of diabetes medications but rather are an integral part of the Insulin Pricing Scheme and are responsible for artificially inflating the price of diabetes medications.

- Defendants continue to make these misrepresentations and publish prices generated by the Insulin Pricing scheme; diabetic Mississippians continue to purchase diabetes medications at Defendants' prices as a result of the ongoing Insulin Pricing Scheme.

436. Defendants' conduct and practice was also unfair to Mississippi consumers because it was likely to cause substantial injury and cannot be reasonably avoided. Furthermore, there are no countervailing benefits to consumers that result from Defendants egregiously raising the price of the at-issue drugs. In particular:

- Mississippi diabetics need these diabetes medications to survive.

- Manufacturer Defendants make nearly every single vial of insulin available in Mississippi.

- The price increases for the at-issue drugs bear no relation to manufacturing or production cost increases or changes in supply and demand conditions.

- In fact, the prices have become so untethered from production costs, that insulins, which the Manufacturer Defendants could *profitably price at $2 a vial*, are now priced at up to $400 a vial.

- There are no conceivable benefits to diabetic Mississippians to being forced to pay these egregious prices for medicines they need to stay alive. In fact, the opposite is true—as a direct result of Defendants' egregious price increases, Mississippi diabetics' financial security, health and wellbeing have been severely and detrimentally impacted.

437.  Defendants acted knowingly and in a willful, wanton or reckless disregard for the safety of others in committing the violations of the Mississippi Consumer Protection Act described herein.

438.  Each at-issue purchase diabetic Mississippians made for diabetes medications at the prices generated by the Insulin Pricing Scheme constitutes a separate violation of the Mississippi Consumer Protection Act.

439.  The Attorney General has determined that the imposition of an injunction against Defendants prohibiting the conduct set forth herein is in the public interest, and the State is seeking the entry of a permanent injunction prohibiting Defendants' conduct in violation of the Mississippi Consumer Protection Act.

440.  As a direct and proximate result of Defendants' conduct in committing the above and foregoing violations of the Mississippi Consumer Protection Act, Defendants are directly and jointly and severally liable to the State for all restitution, damages, punitive damages, penalties and disgorgement for which recovery is sought herein, including but

not limited to, diabetic Mississippians paying inflated prices generated by the Insulin

Pricing Scheme for diabetes medications every time they paid for an at-issue drug.

**Second Cause of Action**
**Mississippi Consumer Protection Act. Miss. Code §§ 75-24-1, *et seq***

**(By the State in its capacity as a payor for and purchaser of the at-issue diabetes medications against Defendants)**

441.   The State of Mississippi re-alleges and incorporates herein by reference each

of the allegations contained in the preceding paragraphs.

442.   The State alleges that conditions precedent to filing this Mississippi

Consumer Protection Act claim have been performed or have occurred.

443.   Defendants are "persons" within the meaning of, and subject to, the

provisions of the Mississippi Consumer Protection Act, *e.g.*, Miss. Code § 75-24-3(a).

444.   By engaging in the Insulin Pricing Scheme, as described herein, Defendants

have committed acts of unfair and deceptive trade practices and acts in the conduct of

trade or commerce within the State, including in Hinds County, as prohibited by Miss.

Code § 75-24-5, directly or indirectly, affecting the State as purchaser of and reimburser

for the at-issue drugs.

445.   Defendants have repeatedly and willfully engaged in the following conduct,

which constitutes a deceptive trade practice and a violation of the Mississippi Consumer

Protection Act:

- "[R]epresenting that goods or services have . . . characteristics . . . which they do not have . . ." Miss. Code § 75-24-5(2)(e). In particular:
  - A characteristic of every commodity in Mississippi's economy is its price, which is represented by every seller to every buyer that the product being sold is being sold at a legal, competitive, and fair market value.

94

- ○ At no point did Defendants reveal that the prices associated with the lifesaving diabetic treatments at issue herein were not legal, competitive or at fair market value.

- ○ At no point did Defendants disclose that the prices associated with the at-issue drugs were generated by the Insulin Pricing Scheme.

- ○ In furtherance of Defendants' fraudulent conspiracy, at least once a year for each year during the relevant time period Defendants reported and published false prices for each at-issue drug and in doing represented that the reported prices were the actual, legal and fair prices for these drugs and resulted from competitive market forces.

- ○ In addition, with respect to the PBM Defendants, by granting the at-issue drugs preferred formulary position on their standard formularies— formulary positions that the PBMs represent are reserved for reasonably priced drugs and that are meant to promote the health of diabetics—PBM Defendants knowingly and purposefully utilized the false prices that the PBMs knew were generated by the Insulin Pricing Scheme.

- ○ PBM Defendants ensured that prices generated by the Insulin Pricing Scheme would harm payors, including the State.

- ○ PBM Defendants also represented that their formularies were promoting the health of diabetic Mississippians, including diabetic Beneficiaries of the State's health plans and in state-run facilities.

- ○ Defendants' representations are false, and at all relevant times Defendants knew they were false. Both sets of Defendants knew that the prices they reported and utilized are artificially inflated for the purpose of maximizing profits pursuant to the Insulin Pricing Scheme.

- ○ PBM Defendants also knew that their formularies were not promoting the health of diabetic Mississippians, including diabetic Beneficiaries of the State's health plans, facilities and programs but rather were fueling the precipitous price increases that were driving up the prices paid by payors, including the State.

- ○ At all times relevant hereto, Defendants affirmatively withheld this truth from the State even though Defendants knew that the State's intention was to pay the lowest possible price for diabetes medications and expectation was to pay a price that resulted from competitive and transparent market forces.

- • "[M]aking false or misleading statements of fact concerning the reasons for, existence of, or amount of price reductions." Miss. Code § 75-24-5(2)(k).

95

o   In particular, at all relevant times, PBM Defendants made false and misleading statements concerning the reasons for, existence of, and amount of price reductions by misrepresenting that the Manufacturer Payments that PBM Defendants receive and the negotiations the PBMs engage in with the Manufacturer Defendants lowers the overall price of diabetes medications and promotes the health of diabetics.

o   At all times relevant hereto, these representations were false and Defendants knew they were false when they made them. At all relevant times, PBM Defendants knew that the Manufacturer Payments they receive and their negotiations with the Manufacturers are not reducing the overall price of diabetes medications or promoting the health of diabetics, but rather are an integral part of the Insulin Pricing Scheme and are responsible for artificially inflating the price of diabetes medications.

o   Defendants continue to make these misrepresentations and publish prices generated by the Insulin Pricing Scheme; the State continues to purchase and reimburse for diabetes medications at Defendants' prices as a result of the ongoing Insulin Pricing Scheme.

446.   Defendants' conduct and practice was also unfair to the State because it was likely to cause substantial injury and cannot be reasonably avoided. Furthermore, there are no countervailing benefits to the State that result from Defendants' egregiously raising the price of the at-issue drugs. In particular:

- Diabetic Beneficiaries in the State's health plans and in state-run facilities need these diabetes medications to survive.

- The health and well-being of the State's Beneficiaries are essential to the State's ability to fulfill its mission as a State government and the State's obligations to provide the services it does in its state-run facilities and programs.

- Manufacturer Defendants make nearly every single vial of insulin available in Mississippi.

- The price increases for the at-issue drugs bear no relation to manufacturing or production cost increases or changes in supply and demand conditions.

- In fact, the prices have become so untethered from production costs, that insulins, which the Manufacturer Defendants could *profitably price at $2 a vial*, are now priced at up to $400 a vial.

96

- There are no conceivable benefits to the State being forced to pay these egregious prices for medicines its Beneficiaries need to be productive and stay alive.

447.   Defendants acted knowingly and in a willful, wanton or reckless disregard for the safety of others in committing the violations of the Mississippi Consumer Protection Act described herein.

448.   Each at-issue purchase the State made for diabetes medications at Defendants' artificially inflated prices, which was a direct result of Defendants' misrepresentations and fraudulent scheme, constitutes a separate violation of the Mississippi Consumer Protection Act.

449.   The Attorney General has determined that the imposition of an injunction against Defendants prohibiting the conduct set forth herein is in the public interest, and the State is seeking the entry of a permanent injunction prohibiting Defendants' conduct in violation of the Mississippi Consumer Protection Act.

450.   As a direct and proximate result of Defendants' conduct in committing the above and foregoing violations of the Mississippi Consumer Protection Act, Defendants are directly and jointly and severally liable to the State for all restitution, damages, punitive damages, penalties and disgorgement for which recovery is sought herein, including but not limited to the State paying excessive and inflated prices for diabetes medications described herein every time it paid for an at-issue drug.

### Third Cause of Action
### Unjust Enrichment

### (By the State in its *parens patriae* capacity on behalf of Mississippi diabetics against Defendants)

451.   The State of Mississippi re-alleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs.

452.   Defendants knowingly, willfully and intentionally deceived diabetic Mississippians and have received a financial windfall from the Insulin Pricing Scheme at the expense of diabetic Mississippians.

453.   Defendants wrongfully secured and retained unjust benefits from diabetic Mississippians and as a result of the Insulin Pricing Scheme, in the form of amounts paid for diabetes medications and fees and payments collected based on the prices generated by the Insulin Pricing Scheme.

454.   It is inequitable and unconscionable for Defendants to retain these benefits.

455.   Defendants knowingly accepted the unjust benefits of their fraudulent conduct.

456.   Accordingly, Defendants should not be permitted to retain the proceeds from the benefits conferred upon them by diabetic Mississippians. The State seeks disgorgement of Defendants' unjustly acquired profits and other monetary benefits resulting from their unlawful conduct and seeks restitution and/or recission, in an equitable and efficient fashion to be determined by the Court.

457.   As a direct and proximate cause of Defendants' unjust enrichment at the expense of diabetic Mississippians as referenced above, diabetic Mississippians suffered ascertainable losses and damages as specified herein in an amount to be determined at trial.

## Fourth Cause of Action
## Unjust Enrichment

### (By the State in its capacity as a payor for and purchaser of the at-issue diabetes medications against Defendants)

458.   The State of Mississippi re-alleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs.

459.   Defendants knowingly, willfully and intentionally deceived the State and have received a financial windfall from the Insulin Pricing Scheme at the expense of the State.

460.   Defendants wrongfully secured and retained unjust benefits from the State and as a result of the Insulin Pricing Scheme, in the form of amounts paid for diabetes medications and fees and payments collected based on the prices generated by the Insulin Pricing Scheme.

461.   It is inequitable and unconscionable for Defendants to retain these benefits.

462.   Defendants knowingly accepted the unjust benefits of their fraudulent conduct.

463.   Accordingly, Defendants should not be permitted to retain the proceeds from the benefits conferred upon them by the State, which seeks disgorgement of Defendants' unjustly acquired profits and other monetary benefits resulting from their unlawful conduct and seeks restitution and/or recission, in an equitable and efficient fashion to be determined by the Court.

464.   As a direct and proximate cause of Defendants' unjust enrichment at the expense of the State as referenced above, diabetic Mississippians suffered ascertainable losses and damages as specified herein in an amount to be determined at trial.

## Fifth Cause of Action

## Civil Conspiracy

465.   The State of Mississippi re-alleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs.

466.   Defendants' conduct described herein constitutes a civil conspiracy and aiding and abetting each other to violate Mississippi Consumer Protection Act and to commit the tort of unjust enrichment.

467.   In particular, each of the PBM and Manufacturer Defendants agreed to and carried out acts in furtherance of the Insulin Pricing Scheme that artificially and egregiously inflated the price of diabetes medications.

468.   Each Defendant made a conscious commitment to participate in the Insulin Pricing Scheme.

469.   Manufacturer Defendants agreed with PBM Defendants to intentionally raise their diabetes medication prices and then pay back a significant portion of those prices to PBM Defendants.

470.   In exchange for Manufacturer Defendants' inflating their prices and making large secret payments, PBM Defendants agreed to and did grant preferred formulary status to Manufacturer Defendants' diabetes medications.

471.   Each Defendant shares a common purpose of perpetuating the Insulin Pricing Scheme and neither PBM Defendants nor Manufacturer Defendants alone could have accomplished the Insulin Pricing Scheme without their co-conspirators.

472.   PBM Defendants need Manufacturer Defendants to inflate the reported price of their diabetes medications and to make secret payments back to PBM Defendants in order for PBM Defendants to profit off the Insulin Pricing Scheme.

473. Manufacturer Defendants need PBM Defendants to grant their diabetes medications preferred formulary placement in order to maintain access to a majority of payors and diabetics.

474. As discussed throughout this Second Amended Complaint, including, but not limited to, paragraphs 115, 155, 185, 289-298, 309 and 316-321, the Insulin Pricing Scheme resulted from explicit agreements, direct coordination, constant communication and exchange of information between the PBMs and the Manufacturers.

475. In addition to the preceding direct evidence of an agreement, Defendants' conspiracy is also demonstrated by the following indirect evidence that Defendants conspired to engage in fraudulent conduct:

- Defendants refuse to disclose the details of their pricing structures, agreements and sales figures in order maintain the secrecy of the Insulin Pricing Scheme;

- Numerous ongoing government investigations, hearings and inquiries have targeted the Insulin Pricing Scheme and the collusion between the Manufacturer and PBM Defendants, including:

  o In 2016, Manufacturer and PBM Defendants received civil investigative demands from at least the State of Washington relating to the pricing of their insulin products and their relationships with PBM Defendants;

  o In 2017, Manufacturer Defendants received civil investigation demands from the States of Minnesota, California and Florida related to the pricing of their insulin products and their relationships with the PBMs;

  o Letters from numerous senators and representatives in recent years to the Justice Department and the Federal Trade Commission asking them to investigate potential collusion among Defendants;

  o A 2017 House Oversight committee investigation into the corporate strategies of drug companies, including Manufacturer Defendants, seeking information on the increasing price of drugs and manufacturers efforts to preserve market share and pricing power;

  o A 2018 Senate report titled "Insulin: A Lifesaving Drug Too Often Out Of Reach" aimed addressing the dramatic increase in the price of insulin; and

- o Several 2019 hearings before both the Senate Financing Committee and the House Oversight and Reform Committees on the Insulin Pricing Scheme and the collusion between the PBMs and the Manufacturers; and

- o Senate Finance Committee's recent two-year probe into the Insulin Pricing Scheme and the conspiracy between the Manufacturers and the PBMs.

- The astronomical rise in the price of the at-issue drugs coincides with PBM Defendants' rise to power within the pharmaceutical pricing system starting in 2003.

### VII.   Motion for Injunction Pursuant to Miss. Code 75-24-9

476.   The State of Mississippi re-alleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs.

477.   By Defendants' violations of the Mississippi Consumer Protection Act, the State and Mississippi diabetic residents have suffered, and will continue to suffer, immediate and irreparable injury, loss and damage, as discussed herein.

478.   The ongoing and threatened injury to the State and Mississippi diabetic residents outweighs the harm that an injunction might do to Defendants.

479.   As a direct and proximate result of the conduct of the Defendants in committing the above and foregoing acts, the State moves this Honorable Court for injunctive relief against the Defendants pursuant Miss. Code 75-24-9, thereby enjoining Defendants from committing future violations of the Mississippi Consumer Protection Act.

480.   Granting an injunction is consistent with the public interest because it will protect the health and economic interests of Mississippi residents and the State, as well as the integrity of the Mississippi marketplace.

## VIII.  AD DAMNUM

WHEREFORE, PREMISES CONSIDERED, the State prays for entry of judgment against the Defendants for all the relief requested herein and to which the State may otherwise be entitled, specifically, but without limitation, to-wit:

A.    That the Court determine that Defendants have violated the Mississippi Consumer Protection Act, have been unjustly enriched and have engaged in a civil conspiracy;

B.    Judgment in favor of the State and against the Defendants for damages in excess of the minimum jurisdictional requirements of this Honorable Court, in a specific amount to be proven at trial;

C.    That the Plaintiff, the State of Mississippi, be granted the following specific relief:

1.    In accordance with Miss. Code 75-24-9 that Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy or combination alleged herein in violation of the Mississippi Consumer Protection Act, or from entering into any other contract, conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect;

2.    In accordance with Miss Code. 75-24-19(1)(b) that the State of Mississippi be awarded civil penalties of Ten Thousand Dollars ($10,000) for each purchase of an at-issue drug in Mississippi during the relevant time period at a price generated by the Insulin Pricing Scheme.

3.    In accordance with Miss. Code 75-24-11 that Defendants be ordered to restitute any and all monies to the State of Mississippi for its purchases of the at-issue drugs and the purchases of its citizens.

4.    That Plaintiff, bringing this action on behalf of the State of Mississippi in its proprietary capacity on its own behalf, and on behalf of Mississippi residents:

    i.    be awarded restitution, damages, disgorgement, penalties and/or all other legal and equitable monetary remedies available under the state laws set forth in this Second Amended Complaint and the general equitable powers of this Court in an amount according to proof;

    ii.   be awarded punitive damages in accordance with Miss. Code 11-1-65 because Defendants knowingly, willfully and intentionally harmed the health, wellbeing and financial interests of diabetic Mississippians and the State;

    iii.  be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of the Second Amended Complaint in this action;

    iv.   recover its costs of suit, including its reasonable attorney's fees, as provided by law; and

    v.    be awarded such other, further and different relief as the case may require and the Court may deem just and proper under the circumstances.

RESPECTFULLY SUBMITTED this the 24th day of September, 2021.

LYNN FITCH, ATTORNEY GENERAL
STATE OF MISSISSIPPI

By:     /s/ Tricia L. Beale
        Tricia L. Beale, Esquire
        MS Bar No. 99113
        Special Assistant Attorney General
        Consumer Protection Division
        Mississippi Attorney General's Office
        1141 Bayview Avenue, Suite 402
        Biloxi, Mississippi 39530
        Phone: (228) 386-4404
        Tricia.Beale@ago.ms.gov


Of Counsel:

**LISTON & DEAS PLLC**

/s/ W. Lawrence Deas
W. Lawrence Deas (MS Bar #100227)
lawrence@listondeas.com
William Liston III (MS Bar #8482)
william@listondeas.com
LISTON & DEAS PLLC
605 Crescent Blvd., Suite 200
Ridgeland, Mississippi 39157
Tel. (601) 981-1636
Fax. (601) 982-0371